| | |
|---|---|
| LORRAINE HARMER, | : **Civil Action No. 2:18-05433** |
| | : |
| Plaintiff, | : **SECOND** |
| | : **AMENDED COMPLAINT** |
| v. | : |
| | : |
| PENNSYLVANIA STATE EDUCATION ASSOCIATION, | : |
| CHESTER COUNTY INTERMEDIATE UNIT, | : **JURY TRIAL DEMANDED** |
| CHIP HARPER, | : |
| DR. JOSEPH O'BRIEN, | : |
| MAUREEN LINAHAN, | : |
| MARY CURLEY *and* | : |
| IAIN STRACHAN, | : |
| | : |
| Defendants. | : |

## SECOND AMENDED COMPLAINT

Plaintiff, Lorraine Harmer, *pro se*, files this Second Amended Complaint asserting claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (hereinafter §1983); the First Amendment (by and through 42 U.S.C. § 1983); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 (hereinafter Rehabilitation Act); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (hereinafter Title VII); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112-12117 *et seq.* (hereinafter ADA); the Americans with Disabilities Amendments Act, 42 U.S.C. §§ 12101 *et seq.*(hereinafter ADAAA)*;* Title II, Part 35, of the Americans with Disabilities Act, 28 CFR Part 35 § 35.101 *et seq.* 42 USC 12131 *et. seq.* (hereinafter Title II); the Family and Medical Leave Act of 1993, 29 U.S.C.§§ 2601 *et seq.* (hereinafter FMLA); the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 (hereinafter PHRA); Title IX of the 1972 Federal Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (hereinafter Title IX); the Pennsylvania Statutes Title 43 PS Labor § 1101.1201 (hereinafter Unfair Practices); and the Pennsylvania

Whistleblower Law, 43 Pa.C.S. §§ 1421 *et seq.* (hereinafter PWL).

Plaintiff seeks declaratory and injunctive relief, actual damages, compensatory damages, punitive damages, *complete* reinstatement, attorneys' fees, litigation costs, and pre- and post-judgment interest as remedies for Defendants' violations of her rights.[1] In support whereof, Plaintiff avers as follows:

[1] Effective August 24, 2020 Plaintiff was reinstated into her position as a Mathematics Teacher by Defendant CCIU. However, Plaintiff has not been reinstated into her supplemental positions with Defendant CCIU. Nor, is Plaintiff in receipt of her "full make whole remedy" pursuant to an Opinion and Award issued by Arbitrator Kathleen Miller in March 2020, as pertains to a grievance related to the underlying facts and circumstances for this matter wherein Arbitrator Miller stated, "CCIU has not established a convincing basis on which to conclude that Grievant [Plaintiff] resigned from her job, as provided for under the [Pennsylvania Public] School Code [of 1949, 24 P.S.], that she abandoned her job, as contemplated under existing case law, or that there was just cause for her dismissal under the [Collective Bargaining Agreement] CBA." (See, Opinion and Award, attached hereto as "Exhibit 2")

## **PARTIES**

1. Plaintiff Lorraine Harmer ("Plaintiff") is an adult individual resident and citizen of the Commonwealth of Pennsylvania.

2. Defendant Chester County Intermediate Unit ("CCIU") is a governmental entity – a regional educational service agency and public entity, established by the Pennsylvania General Assembly which provides services to various school districts. Defendant consists of nearly 86,000 public and non-public school students and over 6,000 educators.

   a. Defendant CCIU runs separate divisions within the overarching agency, including but not limited to a Communications & Online Learning Solutions Division ("Communications") and an Innovative Educational Services Division ("IES").

   b. Defendant CCIU's Communications Division operates Brandywine Virtual Academy ("BVA") – where Plaintiff physically worked, as a Mathematics Teacher.

   c. According to Defendant CCIU's (circa 2018) website:

      [BVA] was formed to provide schools the resources and flexibility to serve students who wish to learn online. It is managed and operated by the

[CCIU], but the credits align with a student's assigned school. []

BVA offers a wide range of computer-based courses that students take over the Internet. Students may complete their courses from a school-based classroom, computer lab, home, or other locations with Internet access.

The courses are developed and taught by Pennsylvania-certified teachers. In addition, BVA curriculum (unlike national providers) includes and assesses Pennsylvania state standards.

    d.   Defendant CCIU (and therefore BVA) works between the Pennsylvania State Department of Education ("PDE") and students' local school districts, including but not limited to The School District of Philadelphia ("SDoP"). The student's assigned school districts are referred to as Local Education Agencies ("LEA"). [2]

    e.   Plaintiff also completed supplemental work for Defendant CCIU's IES division as a Course Developer and as an Instructor for varied programs and courses, including but not limited to, Defendant CCIU's Integrative STEM Endorsement program.

3. Defendant Pennsylvania State Education Association ("PSEA") is a labor organization with a principal place of business located at 1512 McDaniel Drive West Chester, Pennsylvania 19380.

4. Defendant Chip Harper ("Mr. Harper") is CCIU's Supervisor of Online Learning and maintains a principal place of business located at 455 Boot Road, Downingtown, Pennsylvania, 19335.

5. Defendant Dr. Joseph O'Brien ("Dr. O'Brien") was CCIU's Executive Director and he did maintain a principal place of business located at 455 Boot Road, Downingtown, Pennsylvania, 19335.

---

[2] The term "Local Educational Agency" is defined as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." Ed 1102.03(o); 34 CFR 300.28

6. Defendant Maureen Linahan ("Ms. Linahan") is CCIU's Assistant Director of Human Resources and maintains a principal place of business located at 455 Boot Road, Downingtown, Pennsylvania, 19335.

7. Defendant Mary Curley ("Ms. Curley") is CCIU's Director of Communications and Online Learning Solutions and maintains a principal place of business located at 455 Boot Road, Downingtown, Pennsylvania, 19335.

8. Defendant Iain Strachan ("Mr. Strachan") was CCIU's Director of Human Resources and he did maintain a principal place of business located at 455 Boot Road, Downingtown, Pennsylvania, 19335.

9. At all relevant times, Defendants acted or failed to act, by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment.

10. Defendants were an "employers" and Plaintiff was an "employee" within the meaning of the applicable law.

11. Defendants systematically and willfully violate workers' rights.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. Plaintiff timely filed multiple charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") alleging violations of Title VII, the ADA and the PHRA.

   a. On January 11, 2018, Plaintiff completed a Pre-Charge Inquiry, resulting in the creation of Inquiry # **530-2018-01566** against both Defendants PSEA and CCIU, with allegations of discrimination on the basis of sex, discrimination of the basis of disability, and retaliation for (1) informing of an intent to file a charge of job discrimination, (2) contacting a government agency to complain about job

discrimination, (3) complaining to her employer about job discrimination, (4) helping or witnessing someone else's complaint about job discrimination, and (5) requesting an accommodation for her disability or religion.

b.  On June 11, 2018, Plaintiff, by and through counsel, filed separate charges of discrimination against Defendant PSEA and Defendant CCIU, resulting in Charge # **530-2018-04191** and Charge # **530-2018-01566**; respectively.  Charges encompassed the allegations in Plaintiff's Pre-Charge Inquiry, as well as Failure to Accommodate / Hostile Work Environment and Continuing Action (ECF Doc. No. 2).

c.  On December 3, 2018, Plaintiff, by and through an agent of the EEOC, filed a charge of discrimination against Defendant CCIU, for continuing acts of retaliation; resulting in Charge # **530-2019-00524**.  This, for CCIU's actions to screen Plaintiff from employment opportunities in units other than where the unit was working because – it stated – she had filed a lawsuit against them.

d.  On April 4, 2019, Plaintiff, by and through an agent of the EEOC, filed a charge of discrimination against Defendant CCIU for retaliation; resulting in Charge # **530-2019-03245**.  This, due to CCIU's failure to conduct any reasonable investigation of her complaints – with parties Plaintiff named in her complaints overseeing any alleged investigation(s), and ruling on her appeal(s) thereof.

e.  On August 3, 2019, Plaintiff, by and through an agent of the EEOC, filed a charge of discrimination against Defendant PSEA for continuing acts of retaliation; resulting in Charge # **530-2019-01834**.  This, for PSEA's denying Plaintiff any legal representation for her upcoming arbitration because Plaintiff: (1) declared on multiple occasions that she believed there was a conspiracy between Defendants PSEA and CCIU to terminate her employment, (2) stated that she intended to present

evidence to the same at her arbitration, and (3) filed a federal lawsuit against PSEA (as connected to the EEOC issued Right to Sue letter for Discrimination and Retaliation). This determination, and reasons for it, by PSEA was memorialized in a letter sent to Plaintiff on February 4, 2019 from Defendant PSEA's attorney in this matter, Scott P. Stedjan, Esq. (See, letter attached hereto as "Exhibit 3").

13. EEOC issued Plaintiff Notices of Right to Sue within 90 days for all of the aforementioned charges and more than one year has elapsed since PHRC assumed jurisdiction over all of Plaintiff's charges.

14. Plaintiff timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## JURISDICTION AND VENUE

15. This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and § 1343 because it involves questions of federal law, and supplemental jurisdiction over Plaintiff's state law claims under to 28 U.S.C. § 1367.

16. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because the unlawful practices alleged herein occurred within the jurisdiction of this Court: a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this district and Defendants are subject to personal jurisdiction here.

17. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## HISTORICAL FACTS

18. Plaintiff started her employment with CCIU on January 14, 2014, as a long-term substitute mathematics teacher with the Brandywine Virtual Academy (BVA).

19. From January to June 2014, Plaintiff reported to Ms. Jane Houtmann ("Ms. Houtmann");

supervisor of BVA.

20. During this period, Plaintiff disclosed a sciatica diagnosis to Ms. Houtmann and requested a reasonable accommodation to use a kneeling chair for her workstation. Ms. Houtmann approved the request, and Plaintiff provided her own kneeling chair.

21. Plaintiff was hired as a permanent math teacher at CCIU's Brandywine Virtual Academy, beginning in August 2014.

22. Plaintiff has been a member of PSEA since at least August 2014.

23. At all relevant times since August 2014, Plaintiff reported to Defendant Harper.

   a. For the 2014-2015 academic year, Plaintiff was evaluated by Defendant Harper to be Proficient in her professional teaching duties (on scale of Failing – Needs Improvement – Proficient – Distinguished, a 0-3 point scale)

   b. For the 2016-2017 academic year, Plaintiff was evaluated by Defendant Harper to be Distinguished in her professional teaching duties (2.8 on the 0-3 point scale).

   c. For the 2017-2018 academic year, Ms. Harmer was evaluated by Defendant Harper to be Distinguished in her professional teaching duties (2.75 on the 0-3 point scale).

24. The next higher levels of authority over Plaintiff were Defendants Curley and O'Brien.

25. Throughout the course of Plaintiff's employment, she suffered from qualifying health conditions under the ADA, including but not limited to Fibromyalgia, Generalized Anxiety Disorder ("GAD"), and Exudative Macular Degeneration.

   a. Defendant Harper became aware of Plaintiff' health conditions and informal accommodations were put in place, including, but not limited to, flexible scheduling so Plaintiff could attend appointments for her health conditions (i.e. flexing Plaintiff's work schedule to an earlier start time, a later start time, and/or splitting her work schedule; between the hours of 7:30am-8pm when BVA is most

often in operation).

    b.   This reasonable accommodation to flex her schedule afforded Plaintiff the ability to enjoy the benefits and privileges of employment – by being more present at work to complete her essential job functions and duties – without necessitating Plaintiff's use of allotted sick leave to attend appointments for her qualifying health conditions.

26.  During the late summer / early fall of 2014, BVA was actively seeking a department chair for its math department.

    a.   When the opportunity was first publicized, it provided that an Instructional Level I teacher, like Plaintiff, could apply; and Plaintiff did apply.  In fact, Plaintiff was the only BVA math teacher who initially applied for the opportunity.

    b.   However, Plaintiff was excluded from the opportunity when the requirements were increased to include only Instructional Level II teachers.

    c.   All BVA math teachers aside from Plaintiff were Instructional Level II teachers; however, Plaintiff had more overall years of teaching experience than did her counterparts.

    d.   After Plaintiff later received her notice of employment termination (for, in part, utilizing sick time available to her, to care for her health conditions), she received a so-called *Loudermill* hearing; which accords due process to a public sector employee who has a property interest in her employment. *Cleveland Board of Education v. Loudermill*, Education v. Loudermill, 470 U.S. 532 (1985).

    e.   At her *Loudermill* hearing, Plaintiff heard Defendant Curley say to Defendant Harper about the increased requirements for the Chair of the Math Department position: "I changed that job listing and aren't we glad I did that, now?"

27. In spring 2015, Plaintiff suffered a "low back sprain/strain".

    a. On April 27, 2015, Plaintiff's health care provider requested a work restriction to "limit her sitting time during the day". This health care provider requested Plaintiff be provided the accommodation to work from home for a period of two weeks to "allow her low back to heal and still be able to perform her job duties".

    b. On the same day, Defendant Harper denied the accommodation to work from home, and directed Plaintiff to use her sick time; and informed Plaintiff this decision was made by "HR". This, denial despite the fact that the same accommodation was at that exact time being afforded to a BVA Teacher who was similarly situated to Plaintiff, for **his** back-related condition.

    c. On April 28, 2015, Plaintiff emailed Defendant Harper as follows:

> Hi Chip,
>
> Thanks for getting back to me about HR's decision today.
>
> I must admit I'm a little confused about why I must take my sick days and cannot work from home when I am capable of completing all my work duties except sitting. I appreciate any insight you may provide in helping me understand.
>
> That said, if my services are requested I am able and interested in working from home. [T]hinking about my co-workers and hoping to prevent putting my workload on them as well as being present for my students.
>
> Respectfully,
>
> Lorraine

    d. On April 29, 2015, Defendant Harper replied to Plaintiff as follows:

> Hi Lorraine,
>
> I understand and appreciate what you are saying :) Please take the time that you need to rest and get well :)

Chip

e. Plaintiff reported to Defendant PSEA by way of Mr. Mark Cottom ("Mr. Cottom"), President of the local association, Chester County Intermediate Unit Education ("CCIUEA") that she was not being afforded an accommodation that was being afforded to another member of the Collective Bargaining Unit; and was instead being forced to use her allotted sick leave.

f. Mr. Cottom advised Plaintiff to follow up with Defendant Harper about the decision "to aide in understanding".

g. Mr. Cottom never informed Plaintiff that the association could consider filing a grievance over any failure to accommodate or any appearing discrimination; nor did Mr. Cottom inform Plaintiff that she could grieve any disputes on her own behalf, as outlined in the Collective Bargaining Agreement (ECF Doc. No. 27-2).

h. Following Mr. Cottom's advice, Plaintiff emailed Defendant Harper as follows:

> Thanks for responding Chip... is there someone in HR I may follow-up with regarding this decision? (To aide in my understanding.)
>
> Thank you!
>
> Lorraine

i. On April 30, 2015, Defendant Harper informed Plaintiff he had not been able to connect with HR yet.

j. Plaintiff inquired with her BVA Representative for CCIUEA, Mr. Bryan Horvat (who was **himself** the similarly situated employee who was afforded the accommodation to work from home) to learn who might be the appropriate HR contact, and was informed it would likely be Defendant Linahan. After confirming with a HR representative, Plaintiff left a voicemail message for Defendant Linahan.

k.  On May 1, 2015, Defendant Harper followed up with Plaintiff, and asked Plaintiff if she would like Defendant Linahan's cell phone number (as Linahan was out of the office); to which Plaintiff replied, "Ok thanks".

l.  On Saturday, May 2, 2015, Defendant Harper provided the number to Plaintiff.

m.  The morning of May 6, 2015, Plaintiff spoke with Defendant Linahan on the phone.

    i.  Defendant Linahan advised Plaintiff she could not work from home because the CCIU "did not want to set a precedent". Plaintiff informed Defendant Linahan she could complete all of her work duties except sitting. In response, Defendant Linahan advised Plaintiff this event did not qualify under the ADA and so modifications to her work station were not required to occur.

    ii.  Plaintiff asked about standing to perform her work duties. Defendant Linahan advised her to discuss the matter with Defendant Harper as such decisions were "made by the department leaders".

    iii.  Defendant Linahan advised Plaintiff to secure a note from her health care provider – before she would be able to return to work.

n.  The same day, at 10:30 a.m., Defendant Harper called Plaintiff and told her she could report for work at 12:30 p.m. Plaintiff provided CCIU Defendant a note from her health care provider indicating she required modifications as follows:

> no sitting > 1 hour w/o ten min break
> preferably standing work station
> until 5/20/2015

o.  However Plaintiff's work station was not modified in any way. Therefore, Plaintiff informed Mr. Cottom of the failures of CCIU Defendant to comply with her health care provider's requests for modifications.

p. Plaintiff's work station was then "modified" by way of Ms. Kris Singer, Administrative Assistant to Defendant Harper, placing two telephone shipping boxes on Plaintiff's desk. Plaintiff was informed she could now stand at her workstation, to perform her job duties; therefore, she did. However, it was never determined that this "modification" provided by Defendant CCIU was ergonomic to Plaintiff's health conditions.

28. On or about July 2015, Defendant Harper directed Plaintiff to help a student on a math test.

   a. Plaintiff responded that the Math Department, in order to protect the academic integrity of the program, together decided it would not help students on assessments (pre-tests, quizzes, and tests); but that they would help students on any assignments. Plaintiff offered to review the assignment(s) preceding the test with the student.

   b. Despite this fact, Defendant Harper ordered Plaintiff to help the student on her test, stating the Math Department had no formal policy in place.

   c. Thereafter, Defendant Harper called for Plaintiff to attend a meeting with him to discuss her response to his directive. During the meeting in Defendant Harper's office, Plaintiff felt very uncomfortable and on the verge of sobbing with Defendant Harper's manner of speaking with her. Therefore, she excused herself and walked out of the meeting.

   d. Plaintiff was not disciplined but was informed by Defendant Harper that if she were to ever walk out of a meeting with him again, it would be considered insubordinate behavior.[3]

---

[3] Years later, when this topic resurfaced pursuant to this matter; Plaintiff asked a male co-worker, who was also a BVA Representative and Vice President of CCIUEA, if he had ever walked out of meetings with Defendant Harper before; and he stated yes. Plaintiff asked him if he was ever considered insubordinate for doing so, and the co-worker stated no, he was not – and he was not ever informed he would be considered to be such for doing so.

   e. Plaintiff reported this incident to Defendant PSEA by way of Mr. David J. Tschachler ("DJT"), BVA Representative and Vice President for CCIUEA. Thereafter, Plaintiff, Defendant Harper, and DJT met to discuss the circumstances surrounding this incident,

and Plaintiff was informed by DJT that she was required to follow any and all directives put forth by Defendant Harper, since he was her supervisor.

29. During the fall of 2015, Plaintiff elected to share with Defendant Harper that she had suffered a "trauma" in her background; and that ***confrontation*** *from male authority* may be problematic for her, as connected to the trauma. [4]

---

[4]   The "trauma" Plaintiff was making reference to was a sexual assault that occurred against her person about ten years prior – whereby Plaintiff was drugged and raped by a male authority figure whom she knew.  The exact specific details were not shared with Defendant Harper in this timeframe.  However, Defendant Harper was to later become aware of the specifics regarding Plaintiff's past circumstances.

   In January 2018, after the extensive retaliations against her person encompassed in this litigation, Plaintiff was diagnosed with Post-Traumatic Stress Disorder ("PTSD") by a medical professional.  In February 2018, a psychologist considered this PTSD diagnosis during an intake evaluation, wherein Plaintiff was diagnosed with Adjustment disorder with mixed anxiety and depressed mood (adjustment disorders are, by definition, associated with some sort of outside condition that is "causing" the problem).  This psychologist recommended Plaintiff undergo a psychiatry intake for diagnostic clarity, and seek out individual psychotherapy (i.e. "talk therapy").  In August 2018, Plaintiff underwent a psychiatric evaluation and the evaluating psychiatrist confirmed her diagnoses of PTSD and GAD.  Plaintiff continues to receive mental health services under the care of this psychiatrist, and a coordinated therapist – focused on providing Plaintiff with coping strategies and skills to help her recover from the incidents surrounding this matter – and related litigations ongoing.

---

30. Moreover, Plaintiff informed Defendant Harper that the reason she had excused herself from the meeting with him months prior was because she had been on the verge of sobbing and did not want to appear unprofessional before him.

31. Thereafter, Defendant Harper told Plaintiff that if a meeting becomes *too intense* "We will table topics and take a break."  Plaintiff also was advised that if she wanted a support person (i.e. a BVA Representative from CCIUEA) to be present than that would also be permitted.  After this time, Mr. Harper became less officious in meetings.  Sometimes, DJT attended meetings with Plaintiff – to serve as a support person for her.

32. As well, on occasions when Plaintiff did *volunteer* to work with students in person at the School District of Philadelphia's 440 N. Broad Street location, Plaintiff always traveled to and from the city with other BVA teacher(s).  Thereby, Plaintiff was informally afforded support person(s) whenever she did *volunteer* to work in the city (about 4 times/ academic year).

33. The informal accommodations of (1) flexible scheduling to attend appointments for her health conditions, (2) a "modified" work station where Plaintiff both sat and stood (but that was never identified to be ergonomic to Plaintiff's specific conditions), (3) breaks / support person during meetings with Defendant Harper, and (4) a support person when traveling to Philadelphia were in place for several years without incident.

34. In and around the months of September 2017 to January 2018, Plaintiff was completing all of her regular assigned work functions and duties – and also covering as a substitute teacher for her co-worker who was first on maternity leave then on extended medical leave; and then Plaintiff was required to concurrently substitute for a second co-worker who entered into an extended absence. This had the effect of burdening Plaintiff with an unequal workload, as compared to her similarly situated peers – most especially on Fridays, when Plaintiff was in effect the only BVA math teacher; with Plaintiff providing mathematical instruction, on demand, to **all** math students of BVA; as no other math teachers were assigned to work on Fridays, and no substitute teachers were hired to fill in for Plaintiff's absent co-workers.

35. During Plaintiff's employment with Defendant CCIU (in or about December of 2017), Plaintiff noticed that a number of students on her assigned rosters – and students on the rosters of other BVA teachers – had completed virtually none of their required online schoolwork, yet they had been promoted from grade level to grade level within their assigned district/LEA.

36. Plaintiff further observed that a multitude of students were not attending the required number of school hours under Pennsylvania state truancy laws but were still promoted from grade level to grade level within their assigned district/LEA.

37. Plaintiff has concerns that students' rights to a Free Appropriate Public Education ("FAPE"), an educational right of all students in the United States, guaranteed by the Rehabilitation Act of 1973 and the Individuals with Disabilities Education Act ("IDEA") are not being met by

Defendant CCIU.

38. Moreover, Plaintiff has concerns Defendant CCIU is mishandling Federal Title I funds allocated to serve the youth enrolled in the Philadelphia Virtual Academy ("PVA"), the pseudonym under which Defendant CCIU's BVA operates to "serve" the students enrolled from the SDoP. PVA students comprised the bulk of Plaintiff's assigned rosters.[5]

[5] Title I, Part A (Title I) of the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act (ESSA) provides financial assistance to local educational agencies (LEAs) and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet challenging state academic standards. Federal funds are currently allocated through four statutory formulas that are based primarily on census poverty estimates and the cost of education in each state

39. On December 13, 2017, expressed concerns of what she reasonably believed to be illegal and fraudulent practices (as discussed in paragraphs 33 and 34) to Defendant Harper. Specifically, Plaintiff reported that numbers of children in PVA, enrolled from the SDoP were being pushed through the academic year without logging in online to complete their online coursework and without achieving passing grades. That is to say, children were not doing any schoolwork, or only limited work, yet were being advanced to the next grade level. Plaintiff stated to Defendant Harper that it appeared attendance and truancy requirements were not being enforced by the LEA, SDoP – CCIU Defendants were allowing students to promote from grade to grade without merit and without doing coursework. Plaintiff refused to participate in such illegalities.

40. Plaintiff further expressed that pre-mature advancement of students by their partnering districts/LEAs and said LEA's failure to enforce truancy laws or other PA codes/regulations regarding academic standards could negatively impact students' performance on state assessments (which in turn directly impacts teacher evaluation scores) and was in essence denying students an adequate education (i.e. FAPE).

41. Defendant Harper responded to Plaintiff by stating that her concerns are pervasive across

the cyber education industry.  Moreover, Defendant Harper stated, "That's what Philly does."  Further, "As a teacher, there is nothing you can do about it."  However, given these were matters of public concern and she a public servant; Plaintiff was not satisfied with Defendant Harper's responses in regards to her reported concerns.

42. The next day, Plaintiff raised her concerns to Mrs. Lisa Miller ("Mrs. Miller"), (Mathematics Teacher and Department Chair within Defendant CCIU), CCIUEA, and PSEA; by way of DJT, expressing concerns about student performance data impacting teacher evaluation scores – for reasons beyond the teachers' own control – and of the truancy and grade promotion violations occurring in BVA operations, specifically for students of the SDoP.  Thereafter, Plaintiff emailed a summary of the conversations had to DJT, Mrs. Miller, and Mr. Horvat.

43. On December 14, 2017 (one day after initially expressing concerns of what she reasonably believed to be fraudulent and illegal practices), Plaintiff was presented with an adverse employment action by way of  a "virtual meeting" held with all BVA Middle School Staff and additional employees from SDop including but not limited to Mr. David Anderson, PVA Principal.  During the meeting Plaintiff was informed of CCIU Defendant's intent to change her schedule and work location from working in Downingtown four days per week to working in Downingtown two days per week and working in Philadelphia two days per week.  Plaintiff was the only announced to be changing her work location and schedule. [6]

[6]  While Plaintiff's salary would have remained the same with this change in schedule/location of work, she would have been subjected to Philadelphia wage tax, added travel expenses, and longer commute time which would have negatively impacted/reduced her over-all compensation.  As well, she would have been expected to keep up with all work duties she presently completed in four days per week – in only two days per week.  Thereby, Plaintiff's overall workload, job functions, and duties would be drastically increased – and on top of the coverages she was already providing for her absent co-workers. (With another of Plaintiff's co-workers to soon be going on maternity leave, and a substitute teacher to be onboarding to cover during that teacher's extended absence.)

44. On December 15, 2017, Plaintiff was denied a request to adjust her schedule to attend her daughter's basketball game; a request historically approved without incident by Defendant

Harper. Therefore, another adverse employment action in connection to Plaintiff's reports.

45. Plaintiff informed Defendant Harper of her intent to take ½ personal day for December 15th. By the time Defendant Harper redacted his prior denial for Plaintiff to adjust her schedule, Plaintiff had already made plans to attend separate meetings with IES Division staff about supplemental works Plaintiff she was to complete for them. Therefore, Plaintiff upheld her request to utilize a ½ personal day; and Defendant Harper did approve her use of it.

46. On December 15, 2017, before leaving CCIU, Plaintiff stopped by Defendant. Harper's office to follow up on her multiple prior inquiries seeking his permission to flex her scheduled hours on December 20th so that she could attend a one-hour holiday party with a customer of BVA – Project Concern, a treatment unit for boys (adjudicated youths) in Coatesville, Pennsylvania – so Plaintiff could further develop rapport with her students. At the time, BVA had approximately fifteen students enrolled from Project Concern, with Plaintiff the assigned math teacher for about ten of them. While all BVA teachers were invited to attend the work-related event, Plaintiff was the only teacher who expressed an interest and requested to attend.

   a. Mr. Harper directed Plaintiff into his office, told her to take a seat, and closed the door to his office. He began the discussion with Plaintiff by stating "I don't understand. Yesterday you stated you were hired to work in Downingtown not Philadelphia, but today you are asking me whether you can go to Coatesville." Plaintiff expressed concerns about driving into Philadelphia – over an hour away—while not having such concerns for Coatesville, which is nearer to her home, and in area which is already familiar to her (this also in connection to Plaintiff's health conditions, which would be exacerbated by the extended and more stressful commute to the city; and even more so Plaintiff's GAD, absent any support person to travel with her through the city).

   b. Plaintiff repeated her concerns to Defendant Harper that her traveling to Philadelphia to

work with 10-15 students would take her away from assisting her other 100+ assigned students, many of whom regularly seek her assistance in the Virtual Office ("VO") – it did not make any sense. The Philadelphia students could attend her weekly synchronous virtual sessions that she already held and/or log into the VO for individualized support.

c. Defendant Harper's **confrontational manner** in the meeting caused Plaintiff great discomfort and she informed Defendant Harper that she did not want to participate in the conversation with only she and he alone in the room. Plaintiff was experiencing great anxiety being alone with Defendant Harper, with him directing clear animus towards her.

d. Despite Plaintiff stating five times that she did not feel comfortable to be alone in the room with Defendant Harper, he continued to escalate the situation and became extremely aggressive towards Plaintiff up to including standing and yelling at her while Plaintiff remained seated, calm, and composed. The circumstances with Defendant Harper were similar to the image below, except Defendant Harper did remain behind his desk during the entirety of his tirade; with Defendant Harper even banging his fist on his desk while yelling at Plaintiff:



e. Defendant. Harper denied Plaintiff's request to adjust her schedule to attend the BVA customer's holiday party and provided no explanation as to why the request was denied.

f. Plaintiff requested to raise the circumstances to Defendant Harper's immediate supervisor, Defendant Curley. This request caused Defendant Harper to become even more hostile towards Plaintiff, further exacerbating Plaintiff's anxiety – and began to invoke feelings associated with her past sexual assault. This, especially because Plaintiff felt trapped in this threatening environment – due to Defendant Harper's past relays that if Plaintiff were to ever walk out of a meeting with him, he would consider her to be insubordinate for doing so; and DJT's directives that Plaintiff must always obey Defendant Harper's orders.

47. Immediately thereafter, Plaintiff also complained about the occurrences with Defendant. Harper to PSEA by way of DJT and Mr. Horvat, via text. She also texted Mr. Cottom that there had been an incident with Defendant. Harper that day. Mr. Cottom responded "Ok"

48. On December 16, 2017 plaintiff informed DJT, via text, in detail of her prior sexual assault and circumstances that occurred in the meeting with Defendant Harper the day prior, including the fact that after both left Defendant Harper's office he several times attempted to direct Plaintiff to return into his office despite her objections.

g. Plaintiff informed DJT that she found Defendant Harper's actions to be very concerning, "I don't think I will feel comfortable ever having a closed door meeting alone with him again. Is this a topic that needs to be addressed through HR?"

h. Mr. Tschachler texted in response, "Chip can't deal with confrontation. I love that you 'raised his awareness' on issues…. The meeting will be what it is. If it's nothing more than a verbal admonishment, no biggie. If they try to escalate it beyond that we will fight them." Subsequent text exchanges included:

| Plaintiff: | I feel like I should be the one writing him up. Bullying and harassment in the workplace. |
| DJT: | I. Think. You. Have. Every. Right. To. Point. Out. Chip's. Behavior |

49. On December 17, 2017, Plaintiff wrote a letter to Defendant Curley explaining her need for further reasonable accommodations and concerns regarding Defendant Harper's aggressive behaviors towards her, as well his failures to adhere to their developed plan to "table topics and take a break" and "bring in a support person" should discussions between the two become too intense for Plaintiff. In the letter Plaintiff disclosed her then suspected PTSD and reminded Defendant Curley of her Fibromyalgia diagnosis, a condition that was past disclosed to Defendant Curley around the time Plaintiff's workstation was "modified" (as discussed *supra*). (ECF Doc. No. 9-1).

50. Plaintiff also provided a copy of the aforementioned letter to DJT and Mr. Cottom. Ms. Shannon Moore, Uniserv of Defendant PSEA, was later provided a copy of the letter by Plaintiff, as were Defendant Strachan, Defendant O'Brien, and Dr. Noreen O'Neill, Director of IES for Defendant CCIU.

51. Unbeknownst to Plaintiff, Defendant Curley forwarded the intended confidential letter to Defendant Linahan, with indicated concerns about the PTSD disclosures (not about Defendant Harper's behaviors). Later, at the *Loudermill* hearing the CCIU stated that they believed plaintiff's PTSD diagnosis prevented her from working with men in authority roles.

52. However, Plaintiff has successfully worked with male authority figures without problems, including but not limited to Mr. Kevin Ballisty, her site Director at the Pennocks Bridge Campus of the Delaware County Community College ("DCCC"); who supervised Plaintiff from 2014 to 2018 (the same exact time period wherein Plaintiff was supervised by Defendant

Harper) in her capacity as an Adjunct Mathematics Professor. Mr. Ballisty will attest that he had no difficulty in working with Plaintiff.

53. On December 18, 2017 at 12:03pm plaintiff sent an email to CCIU HR Generalist Tanya Festa-Piedra, which stated, "Would it be possible to set up a meeting to discuss reasonable accommodations in the workplace due to medical conditions, which [are] protected under the Americans with Disabilities Act?" No reply was received from Ms. Festa-Piedra. However, Ms. Linahan did acknowledge the email during a meeting on December 19th.

54. Shortly thereafter, further discussions that were occurring with Mary Driscoll ("Ms. Driscoll"), Project Manager of the IES Division of the CCIU, regarding plaintiff's development of an Act 45 proposal to submit to PDE, were re-directed to occur with Defendant Harper, despite the fact, that ongoing discussions were not relevant to BVA or to Defendant Harper. [7]

---

[7] Act 45 of 2007 defines continuing professional education requirements for all active school and system leaders employed in the following positions: Principals, Assistant or Vice Principals, Superintendents, Assistant Superintendents, Intermediate Unit (IU) Executive Directors, Assistant IU Executive Directors, Directors of Area Vocational-Technical Schools. Individuals employed in these positions under administrative certificates must earn their continuing professional education requirements in courses and programs that have received Pennsylvania Inspired Leaders (PIL) approval from the Secretary of Education.

a. Plaintiff learned of this change in discussions from IES staff to Defendant Harper by way of an email, at 12:42pm, wherein Ms. Driscoll stated "I had a hallway conversation with Niki [Harvey, Assistant Director of IES] and she suggested you should chat with Chip [Harper] about your idea and then land on the answer to this question."

b. Initial conversations between Ms. Driscoll and Plaintiff, earlier that day, at 8:36am, read "I checked in with Niki and she said that if you'd like to write an Act 45 program around Instructional Rounds to go for it!"

c. Plaintiff identified this change in status (and later removal) to work on developing an Act 45 program for IES, and the irrational direction of the discussion to Mr. Harper, as

retaliatory in nature, appearing to be a direct result of the plaintiff's request for ADA reasonable accommodations on December 18th.

d.   On December 21, 2017 Defendant Harper emailed to Plaintiff "This falls into a gray area regarding CCIU/Independent Consultant, and we need to look into this a little more with HR and policies. I will get back to you"; regarding any Act 45 proposals that were to be developed by Plaintiff for the IES Division of CCIU.

e.   On January 5, 2018 plaintiff received an email from Dr. Harvey, which copied Ms. Driscoll and Ms. Curley, and stated "IES appreciates your enthusiasm and passion. You are a pleasure to work with. At this time, we do not have a need for additional Act 45 programs." Thereby, effectuating this adverse employment action against Plaintiff.

55.  Plaintiff was further denied employment opportunities that were in place with IES, as follows:

a.   On January 5, 2018, at 2:26pm, plaintiff emailed to Ms. Diane Thomson, Project Manager within IES, and Plaintiff's immediate supervisor for her supplemental IES positions, to learn if the Integrative STEM Endorsement cohort was in process to begin in January. As previously arranged, Plaintiff was scheduled to be the Facilitator of the first course.

b.   Ms. Thomson replied at 2:39pm "A few conversations are still happening right now. Sorry for the delay. We will be making our decision very soon. *It got a little complicated* so it's taking an extra day or two." (emphasis added)

c.   For reasons unbeknown to Plaintiff, the Integrative STEM Endorsement cohort did not begin in January as was anticipated. Therefore, Plaintiff lost the job opportunity.

d.   The last date Plaintiff did work for IES was on January 18, 2018 – and Defendant CCIU raised no objections to this, Plaintiff's completion of her last ever assigned IES project.

e. Plaintiff was scheduled to be the assigned instructor of the 4th Course for a cohort moving through the Integrative STEM Endorsement, in March 2018. She was, as well, denied this job opportunity – despite she even applied for her position when it was publicized on Defendant CCIU's website.

f. On March 16, 2018, Dr. O'Neill informed plaintiff, via email, "The HR department has informed me the last information they received from you indicates you are currently unable to work at the CCIU. Additionally it was shared your termination is being recommended at the next board meeting. Based on this information we are unable to move forward with your candidacy for our open positions."

g. It was anticipated that plaintiff would teach another cohort of the Integrative STEM Endorsement scheduled to begin in June/July of 2018. However, Plaintiff was denied this job opportunity through Dr. O'Neill.

h. Additional job opportunities lost to Plaintiff from the IES Division of the IES include STEM Saturday/Instructor Mentor (recurring), Effective Skills and Strategies for Substitute Teachers course Facilitator (recurring), Project Based Learning course Facilitator (anticipated to be recurring), and the aforementioned non-paid opportunity to develop courses intended for submission to the PDE for Act 48 [8] and/or Act 45 approvals. As well, IES and HR agents acted in concert to withhold pay from Plaintiff for work she performed for IES within these timeframes. These actions were retaliatory

[8] Act 48 is a law passed in Pennsylvania stating that all professionally certified teachers in the state must keep their certificate active by completing additional courses to stay current in their field. Course proposals may be submitted to the Pennsylvania Department of Education (PDE) for the approvals required to ensure teachers can receive Act 48 credits upon completion of the course. The law requires that 180 hours' worth of courses must be completed by teachers every five calendar years.
.

i. In fact, plaintiff was denied any job opportunities posted by the IES Division of the CCIU, including posted opportunities for placements in neighboring Intermediate Units.

On October 16, 2018, Dr. O'Neill informed Plaintiff, "I checked in again with our Executive Director and HR. They again informed me that you are currently ineligible for any position within CCIU." Plaintiff was denied the right to apply to 187 available positions in various Intermediate Units throughout the Commonwealth of Pennsylvania. This action was retaliatory.

j. In October 2018, Plaintiff contacted the EEOC about the aforementioned efforts of Defendant CCIU to screen her from jobs beyond itself. In December 2018, an EEOC Senior Investigator – Ms. Jane Duncan – drafted a retaliation charge for Plaintiff (as discussed *supra*). This charge was referred to the Mediation department of the EEOC, and a Right to Sue Letter was issued pursuant to the matter, upon Plaintiff's request.

k. Circumstances regarding the denied employment opportunities by the IES Division of the CCIU, including their initial denial for the Plaintiff to facilitate instruction for the Integrative STEM Endorsement program for which she had just developed the courses, were detailed in Plaintiff's formal CCIU complaint, which was dated March 20, 2018. However, the appointed Independent Investigator, Michelle Mintz, Esq. failed to conduct any investigation or provide any conclusions regarding the actions of the IES Division to remove employment opportunities from the Plaintiff.

56. On December 19, 2017, a meeting with Defendant Linahan, Defendant Curley, DJT, and Plaintiff to discuss the December 17, 2017 letter Plaintiff sent to Defendant Curley occurred. At this meeting, the CCIU immediately implemented reasonable accommodations to allow for 3 to 5 minute breaks and to permit a support person to attend meetings with Defendant Harper, as the two had informally prior developed several years prior.

57. Plaintiff's suspected PTSD was also discussed. Plaintiff was provided a copy of CCIU's developed ADA Request form, and it was suggested that her health care provider complete the

form in further consideration for any reasonable accommodations. It may be noted, that in the letter from Plaintiff to Defendant Curley, discussed *supra*, she discussed her qualifying disability of Fibromyalgia, as well as suspected PTSD.

58. Harassment and Mr. Harper's outlandish behaviors were discussed in the aforementioned meeting. Upon information and belief, Plaintiff was provided a copy of CCIU's harassment and/or discrimination policies and the form CCIU requested be completed to report of such offenses.

59. On December 21, 2017, a meeting occurred with Defendant Linahan, Defendant Curley, DJT, Defendant Harper, and Plaintiff at which the December 15th incident was discussed.

   a.  Defendant Harper claimed he could not recall that Plaintiff stated five times that his actions made her uncomfortable, and that she did not want to continue the conversation alone in his office with no other parties present.

   b.  Notwithstanding, he did state he recalled informing Plaintiff that she could bring a union representative into the meeting (which he stated in response to one of Plaintiff's appeals that he "could not recall").

   c.  Given, no BVA Reps were on site or available, and Plaintiff was not aware of her Weingarten rights or that she could request a union representative from another CCIU program; Defendant Harper's offer was effectively moot.

   d.  Reasonable accommodations were discussed at that meeting. At this time, Plaintiff brought ADA approved recommendations for reasonable accommodations for PTSD and for Fibromyalgia. Defendant Linahan stated that his meeting was only to discuss Plaintiff's PTSD, though she and Defendant Curley took the material for Fibromyalgia. Defendant Harper took the material only for PTSD, upon Defendant Linahan's directive. DJT was given the written materials in advance of the meeting, by Plaintiff.

60. On December 21, 2017, Plaintiff later met individually with Defendant. Linahan, at which Plaintiff informed Defendant Linahan that other female staff were expressing to her of similar encounters (harassment and/or discrimination) by Defendant Harper.

  a. Defendant Linahan informed Plaintiff that her colleagues could make a report to Defendant Linahan or to Defendant Curley.

  b. Female staff, however, expressed concerns that their jobs may be negatively impacted if they came forward. They said they would be willing to share privately with an investigator – if ensured their jobs would remain intact. Plaintiff reported this information back to Defendant Linahan.

  c. On January 5, 2018 at 4:27pm, Ms. Linahan memorialized the conversation – and her knowledge of reported complaints by female staff of BVA – with Plaintiff, in an email:

  > On 12/21/17 when we met separately, you did share you believed other staff members had concerns regarding your supervisor's behavior towards them. You provided no names of these staff members and to date, no one else has come forward indicating any type of harassment or bullying. You now indicate these women do not desire to come forward because they feel their employment status would be impacted.

  d. On or about this same date Defendant Linahan stated she would conduct an investigation into Plaintiff's raised complaints, and Defendant Curley reiterated the same.

  e. However, despite Defendant CCIU's Board-approved policies state an investigation is to be complete, with a report of findings put forth, within fifteen days – none ever was.

  f. Moreover, despite Defendant CCIU's Board-approved policies state oral complaints shall be an acceptable form of reporting; CCIU agents including but not limited to Defendant Linahan, Defendant Strachan, and Defendant O'Brien would repeatedly insist that Plaintiff never submitted a formal written complaint, "pursuant" to CCIU policy.

g. On January 20, 2018, Plaintiff sent an email to the union indicating a possible class action of discrimination and harassment as connected to other female staff[s] at BVA who have experienced similar escalated conversations with Defendant Harper. The union failed to provide any comment.

h. On March 20, 2018, Plaintiff submitted a formal complaint to the Board of Directors of the CCIU, by way of Board Secretary – and Administrative Assistance to Defendant O'Brien – but it was never forwarded to the Board.

i. Despite Defendant O'Brien acknowledged receipt of the Complaint and that an investigation would occur – none ever timely was.

j. In May 2018, Plaintiff hand-delivered her aforementioned written Complaint to the CCIU Board of Directors at its public board meeting, along with corroborating evidence. Still, no timely investigation occurred – again in violation of CCIU's own Board-approved policies.

k. Only after Plaintiff, by and through counsel, filed EEOC Charges and, *pro se*, filed a State Complaint (since rolled into this matter); did Defendant CCIU hired an alleged "independent" investigator. However, said investigator never investigated this complained on matter regarding the mistreatment of certain women at BVA by Defendant Harper, failed to interview BVA staff regarding their experiences with Defendant Harper, or make any related determination in her findings.

l. Neither did Defendant CCIU ever investigate this topic, despite Plaintiff raised it again in a written complaint she submitted to the CCIU Board of Directors in November 2019.

61. On January 5, 2018 at 4:59pm Ms. Linahan sent plaintiff a memorandum summarizing the December 21st group meeting. In her memorandum, Ms. Linahan stated:

Specifically we discussed an email you sent to Mary [Curley] detailing your Post Traumatic Stress Disorder (PTSD) as a result of extensive trauma in your past. You indicated that as a result of this trauma, you have an underlying problem with authority – particularly male authority. You admitted during our meeting that the concern you have regarding the interactions with your supervisor were elevated specifically because of your PTSD and this was not a pattern of escalating behavior nor were you categorizing your concerns as harassment from your supervisor.

a.  In a subsequent email plaintiff disputed Defendant Linahan's characterizations found in her memorandum. Despite Plaintiff's objections, Defendant Linahan would continue to present this false argument again and again – and to use Plaintiff's just disclosed suspected disability against her.

b.  Clearly, Defendant CCIU was regarding Plaintiff as having a substantially limiting impairment, even without any medical certification or confirmation of PTSD.

c.  Plaintiff texted DJT, stating that the January 5, 2018 memo from Ms. Linahan was "just protecting Chip's and CCIU interests… . No other purpose… . I disputed the statement that this was not harassment and was merely my overreaction based on my background…". DJT texted in response "I will read it later."

d.  Within the Independent Report of Investigation published by Ms. Mintz on September 17, 2018, Defendant Curley claims "Ms. Harmer stated that the alleged incident on December 15, 2017 with Mr. Harper where she alleged that he stood and yelled at her was not a pattern of Mr. Harper, but was probably related to her PTSD." Again, CCIU moves to use falsely attribute the irrational actions of Defendant Harper to Plaintiff's recently disclosed – suspected – PTSD.

e.  Moreover, to the alleged independent investigator, Ms. Linahan again stated, "You admitted during our meeting that the concern you have regarding the interactions with your supervisor were elevated specifically because of your PTSD and this was not a pattern of escalating behavior nor were you categorizing your concerns as harassment

from your supervisor."

f.  In Plaintiff's appeal of the alleged findings, Plaintiff disputed Defendant Linahan's statements, as follows:

> Ms. Harmer clearly disputed Ms. Linahan's statements and reiterated her concerns regarding Mr. Harper's aggressive behaviors, especially in light of her disclosed disabilities. Ms. Harmer finds it reprehensible that the Assistant Director of Human Resources – the Title IX Compliance Officer – charged with: overseeing Complaints of Harassment and Discrimination, ensuring CCIU is an Equal Opportunity Employer, and aiding employees in completing ADA Requests when he/she discloses disabilities and seeks reasonable accommodations under the ADA would respond – and continue to respond – in such a manner as to completely disregard the employee's essential statements, and continue to erroneously repeat statements which were so clearly disputed by the employee.

g.  Plaintiff's appeal to the alleged investigative findings disputed Defendant Curley's statements that Plaintiff stated Defendant Harper's aggressive behaviors were "probably related to her PTSD", and moreover Plaintiff stated she finds it reprehensible of a Director to respond to reported aggressive acts by a Supervisor in such a manner

h.  It would be an illogical argument that Defendant Harper's actions towards certain *other women*, would be solely attributable to Plaintiff's own health conditions.

a.  Despite Plaintiff's objection, Defendant O'Brien – who was himself named in the Complaint – upheld the determination of "no violations found".

62.  On January 5, 2018 plaintiff texted DJT to ask if she needed to seek legal counsel and if the union assists with that. She further asked whether the union was concerned with CCIU harassment/fraudulent practices. DJT responded "I will be talking w Mark [Cottom] and Shannon [Moore, of PSEA]".

63.  Plaintiff also texted in regard to the CCIU's harassment policy "I see harassment all over the place with the supervisor based on this document." DJT never replied.

64.     On January 5, 2018 Plaintiff received an email from Defendant Linahan stating that an investigation would be undertaken, as discussed *supra*. However, it never was timely done.

65.     On January 6, 2018, Plainitff informed DJT, via text, of CCIU HR's expressed intent to conduct an investigation and about Defendant Linahan's request that Plaintiff provide the names of female colleagues who expressed concerns regarding Defendant Harper. Plaintiff said she did "not feel comfortable naming names".

66.     Plaintiff also informed DJT that the CCIU harassment policy states if an investigation proves allegations are not truthful then the reporter could face disciplinary action, and requested the PSEA provide her with legal counsel. DJT (CCIU-EA Vice President) informed Plaintiff he would forward the information to Mr. Cottom (CCIU-EA President).

67.     On January 7, 2018, Plaintiff texted DJT to learn if the union would provide legal counsel to represent her before the EEOC. In addition, Plaintiff sent DJT information regarding reasonable accommodations and her filing of a formal complaint with the EEOC. DJT never responded.

68.     On January 8, 2018 Plaintiff again received an email from Defendant Linahan reiterating that an investigation would occur. However, no investigation timely occurred.

69.     On January 8, 2018 plaintiff sent an email to Ms. Lisa Miller (BVA Math Department Chair), which copied Defendant Harper. Plaintiff again expressed concerns about Defendant CCIU's partnering districts/LEAs committing illegal and fraudulent activities which she believed would (1)violate truancy laws, as well as other PA and federal laws/regulations; (2) have a negative effect on student assessment;, and (3) pre-maturely promote students to the next grade level without meeting the academic standards under the State Board of Education codes/regulations.

70.     Plaintiff also informed Ms. Miller (and Defendant Harper) that she believed Defendants'

request for her and other teachers of Defendant CCIU to "go along" with such practices (as discussed *supra*) could also result in violations of state laws and regulations.

71.     In concluding her January 8, 2018 e-mail, Plaintiff informed Ms. Miller and Defendant Harper that she would like to continue the process in formally raising her concerns regarding the aforesaid activities and the fact that Defendant's teachers are being asked to support and knowingly "go along" with same.

72.     Defendant Harper emailed a reply to Plaintiff that same day and copied Ms. Miller and Ms. Curley, to "address the plaintiff's concerns about fraud." Thereby, Defendant Harper fully acknowledged Plaintiff's raised concerns, and the circumstances whereby she was requesting to advance them.

   a. Within the report of findings published by the alleged independent investigator on September 17, 2018, she reported "Ms. Harmer did not raise any issues or concerns about alleged fraudulent practices involving BVA students..."

   b. Moreover, in Ms. Mintz's conclusion she states "Based on the testimony, [including but not limited to that of all Defendants] there is no evidence of a complaint of fraud made by Ms. Harmer."

   73.     Later, Defendant O'Brien would – in a variety of ways – would acknowledge his understandings of the complaints of fraud made by Plaintiff. Moreover, when Plaintiff inquired to Defendant O'Brien about whether teachers of Defendant CCIU were required to go along with any fraudulent practices as requirements of their jobs, Defendant O'Brien stated that the CCIU does as it is hired and contracted to do, by LEAs. Despite the facts, Dr. O'Brien upheld the finding of no violations found.

74.     As a result, of her complaints and refusals to engage in such illegal conduct, Plaintiff was

subjected to severe animosity and hostility, including but not limited to, being subjected to a number of false allegations of wrongdoing by Defendant Harper; and restricted by his limits of whom Plaintiff could and could not speak with.  Specifically, Defendant Harper directed Plaintiff that all of her communications must flow only throw Mrs. Miller, and then thereafter only though the newly hired Dr. Mark Slider, Assistant Supervisor of Online Learning – and known close friend of Defendant Harper.

75.    Around January 8, 2018, the harassment worsened when CCIU management and human resources, including Defendant Linahan, made false statements about Plaintiff to make Plaintiff appear unable to perform her job, including calling Plaintiff "emotionally fragile" and asking Plaintiff if her "doctor cleared her to return to work" (even though Plaintiff was not on medical leave, and was still reporting to work and successfully completing her work duties).  Later, at Plaintiff's Unemployment Compensation hearing – under oath – Defendant Linahan did attribute any appearance of Plaintiff's being "emotionally fragile" directly to the work environment.

76.    Plaintiff then complained again to Defendants Linahan and Curley based on the above harassment and discrimination on the basis of disability and informed the leadership that she had reach out to the EEOC about file a charge of discrimination

77.    More specifically, on January 8, 2018, plaintiff spoke with Defendnat Linahan on the phone. During the conversation Plaintiff inquired about short-term disability and long-term disability, workers compensation, FMLA and asked if she needed to hire an attorney.  Plaintiff began to cry during the conversation.  Ms. Linahan said that Plaintiff appeared emotionally fragile (simply because she was crying) and asked if a doctor "cleared" Plaintiff to return to work despite the fact that plaintiff was not absent from work.

a.   Plaintiff that day called the EEOC and told them of her conversation with Defendant Linahan and was told in effect:  "While I cannot give you advice, it sounds as if you were

retaliated against for disclosure of a disability".

b. On that day, plaintiff received an email in which Defendant Linahan summarized the telephone call, "During our conversation, you indicated this situation is causing you great stress that you feel is a direct result of the work environment. You also indicated this is [e]ffecting your personal life and may overall [e]ffect your ability to complete the essential functions of your position on a daily basis." Defendant Linahan provided plaintiff information regarding Worker's Compensation and a panel of doctors, referencing a work-related mental health injury.

c. In a subsequent email plaintiff disputed Defendant Linahan's characterizations regarding her ability to complete the essential functions of her position.

d. On January 8, plaintiff told Defendant Curley via email of the aforementioned facts and said she also would like to file a complaint with the CCIU regarding Defendant. Linahan's retaliation.

e. Shortly thereafter, Defendant Curley informed plaintiff that Defendant Linahan would no longer be involved in her matter and that Defendant Iain Strachan, CCIU Director of Human Resources would handle her matter in the future.

f. Plaintiff reported the aforementioned facts to PSEA by way of DJT via a telephone conversation and text messages wherein he informed Plaintiff he hoped to have a meeting with Mr. Cottom and the PSEA Southeastern Regional Office, the next day.

78. On January 9, 2018, Ms. Curley requested Plaintiff report to her office, stating no union representatives needed to join her at the meeting. Thereafter, plaintiff informed DJT, Mr. Cottom and Mr. Horvat via email of the topics of discussion:

a. standard CCIU practices in place regarding roles and duties, especially as related to Human Resources,

b. complaints involving Ms. Linahan,

c. email request by plaintiff wherein a time extension to submit the complaint pertaining to Mr. Harper was requested,

d. CCIU discrimination policy,

e. anticipated EEOC filings.

63. Shortly thereafter, plaintiff received an email from Sana Graham (Human Resources Generalist for the IES Division of the CCIU) notifying her of an offer for the STEM (an acronym for Science Technology Engineering Math) Saturday Instructor/Mentor position.  This non-routine email, which Plaintiff interpreted as an organizational showing of force and act of retaliation copied 18 staff members of the CCIU:

- Diane Thomson (Project Manager in IES Division)
- Noreen O'Neill (Director of Innovative Educational Services)
- Danielle Mikolosko (Benefits / HRIS Analyst);
- Amy Thompson (Human Resources Generalist);
- Melissa Salach (Human Resources Generalist Support Administrative Secretary);
- Jocelyn Gilmore (Human Resources Generalist)
- Betsy Radtke (Payroll)
- Anne Robertson (Administrative Secretary)
- Angela Hausch (Administrative Assistant to Director of Human Resources)3
- Sandra McCabe (Director of Finance);
- Maureen Linahan (Assistant Director of Human Resources);
- Danielle Schoeninger (Assistant Director of Human Resources);
- Iain Strachan (Director of Human Resources);
- Tanya Festa-Piedra (Human Resources Generalist);
- Kristin Smith (Human Resources Generalist)4;
- Mary Franciscus (Human Resources Generalist);
- Sharon Krawczun (Compensation/Payroll Manager);
- Pattie Richards (Confidential Secretary)

_____

3    Ms. Hausch was no longer Strachan's administrative  asst. after January 2018.


4    Ms. Smith is no longer employed at CCIU.

79.     Plaintiff was never any threat to herself or to anyone else, nor was there any reason to consider Plaintiff as any threat for the same.

80.     PSEA, by and through DJT and Mr. Cottom, was informed of the same. Plaintiff requested to file grievance(s) regarding the discrimination, harassment, hostilities, and retaliatory acts to which she were being subjected. However, no grievance was ever filed on that matter. Moreover, Plaintiff was never advised that she could file any grievance on her own behalf.

81.     On January 9, 2018, Plaintiff was diagnosed with L5 Radiculopathy (a pinched nerve in the L5 region of the spine, see image below) via a nerve study; and her health care provider completed an ADA Request form for Fibromyalgia and L5 Radiculopathy (Plaintiff did inform Defendant CCIU that she had no formal diagnosis of PTSD – or providers for the same), seeking a number of accommodations for Plaintiff (including an ergonomic workstation, flexible work schedule, leave time to attend therapy sessions and doctor visits, the ability to work from home, and reduction in work-related stressors).



Retrieved from https://www.spineandneurosurgeryhospitalindia.com/images/bilateral-lumber-radiculopathy.jpg

62. On January 10, 2018, Plaintiff met with Defendant Strachan, Defendant Curley, DJT, and Dr. Schoeninger, Assistant Director of Human Resources – and a licensed attorney – to review the completed ADA Request form, as well Plaintiff's complaints against Defendant Linhan and Plaintiff's contact with the EEOC.

63. Plaintiff again requested to the association to file grievance(s) on her behalf, due to the hostile workplace that she was being subjected to. A meeting was set for January 19th.

64. From January 11, 2018 through January 24, 2018, Plaintiff was forced to use her remaining sick and comp time to treat her health conditions since the above reasonable accommodation requests were denied. During this time period, Plaintiff requested the ability to work from home and to utilize leave time so she could both work and attend the recommended therapy sessions but her requests were repeatedly denied.

65. On December 21, 2017 plaintiff submitted a completed application entitled "Working at Home Procedures and Request Form" to Mr. Harper, via email, to be considered for participation in a CCIU-wide work from home pilot opportunity.

    a.    January 10, 2018 – January 11, 2018, plaintiff and Mr. Harper exchanged emails regarding plaintiff's expressed desire to participate in the work from home pilot.

    b.    On January 16, 2018, plaintiff and Mr. Iain Strachan (Director of Human Resources) exchanged emails regarding plaintiff's expressed desire to be considered to participate in the work from home pilot.  Mr. Strachan informed plaintiff decisions would be made on February 1, 2018.

    c.    Upon information and belief, on or about February 1, 2018, all applied BVA teachers were approved to participate in the work from home pilot and did work from home several days each month.  Plaintiff was provided no direct

update from HR regarding the matter.

d.       Moreover, Mr. Harper often approved for BVA teachers to work from home for reasons including, but not limited to, CCIU building constructions, the illness of a child, the illness of a parent, lost car keys, a flat tire, and carpet installation or other home needs.

e.       In fact, DJT (BVA Union Rep and CCIU-EA Vice President) was approved to work from home for extended periods due to his parents' health needs throughout the 2016-2017 and 2017-2018, and Mr. Bryan Horvat (BVA Union Rep) was afforded work from home as an accommodation during his time of employ with BVA. CCIU was not likely to grant the plaintiff ADA accommodations despite providing similar accommodations to others and the plaintiff knowing that CCIU provided it.

66. At some point, Mr. Cottom directed Defendant to redact her sick time and cease communications with Defendant CCIU.  Such actions, if fully followed through, would have set Plaintiff up for charges of job abandonment.  Therefore, these directives were retaliatory, and driven by discriminatory animus.

67. CCIU's human resources department, including Defendants Linahan, Strachan, and Curley were aware Plaintiff was using sick and comp time as a result of her health conditions and the Defendant CCIU's failure to accommodate her.

68. Additionally, Plaintiff's request to work from home was denied despite other individuals outside her protected classes being provided with the same accommodation.

69. CCIU Defendant did request Plaintiff gather additional information and clarifications from her health care providers in order for it to consider the accommodations requested by Plaintiff's health care provider, Dr. Min, Rheumatologist, on January 10th.

70. On January 16, 2018, Plaintiff submitted the additional information and clarifications demanded by CCIU, by way of two new ADA Request forms completed by two separate health care providers; each supporting the same aforementioned accommodations. Thereafter, Defendant Strachan, provided comment – referring back to Plaintiff's dated January 9th ADA Request form.

71. Moreover, Defendant Harper continued to deny Plaintiff's repeated attempts to report to work with the recommended accommodations. These actions were retaliatory, as the accommodations would be no undue hardship for Defendant CCIU to provide.

72. On January 19, 2018, while Plaintiff was in *good faith* still engaged in the interactive discussions afforded under the ADA, she did request Defendant Strachan forward her FMLA paperwork in the event she might want to discuss the option with her health care provider at an appointment scheduled for January 22, 2018; a meeting scheduled to gather even further information for Defendant CCIU, as it stated it must know exactly (1) what accommodation was requested, (2) why it was being requested, and (3) for how long it was being requested (despite the fact CCIU past and future would deny her health care provider's requests for accommodations, even with all the prescribed information).

73. Defendants misinformed Plaintiff about her FMLA rights, attempted to claim she was now actively placed into FMLA leave, and demanded the FMLA paperwork be completed and submitted by some arbitrary deadline in February 2019.

74. Plaintiff immediately objected to being placed into FMLA while they were still engaging in interactive discussions under the ADA.

75. Thereafter, Ms. Danielle Mikolosko, Benefits Specialist and HR to Defendant CCIU, emailed Plaintiff and informed her, in part, that if her requests for reasonable

accommodations were approved – then there would be no need for any FMLA.

76. On January 22, 2018, Plaintiff attended an appointment with her primary health care provider; who did begin to complete now the 4th ADA Request form Plaintiff would present to the CCIU. This form, requested Plaintiff be afforded the accommodation to (1) work from home – or an alternate worksite location, (2) for 2 months due to Plaintiff's generalized anxiety disorder (GAD), and (3) detailed the exact interferences the harassment by management was causing to Plaintiff that were interfering with her ability to do her job.

77. On this day, Plaintiff sent to DJT, Mr. Cottom, and Ms. Moore a handout about GAD; and an excuse note to cover her recent days of absence.

78. On January 23, 2018, Plaintiff returned to her health care provider's office to gather the completed ADA Request form that was seeking accommodations for her GAD.

79. Plaintiff also gathered a note stating she was "ill and unable to work **at BVA**" (but she could work in other locations), as was demanded by the association. Defendant Strachan later admitted, at Plaintiff's unemployment compensation hearing – under oath – that he used the "ill" note to interfere with Plaintiff's student teaching placement for Saint Joseph's University, where Plaintiff was a graduate student in a Master of Science in Special Education program.

80. Thereby, Defendant CCIU, by and through Defendant Strachan, and Defendant PSEA, by and through Mr. Cottom, worked in concert (i.e. conspiracy) to extend their retaliatory acts well beyond their own entities. Their actions forced Plaintiff to have to withdraw from her studies with SJU, as she was unable to secure any immediate student teaching placement.

81. DJT confirmed his delivery of the revised ADA Request form to Defendant CCIU, and Defendant Strachan admitted to his receipt of it during Plaintiff's unemployment

compensation hearing that was held on May 7, 2018.

82. On June 13, 2018, the transcript of testimony from the UC hearing was published, and

detailed Defendant Strachan did testify the following:

> **There was a second or third, more detailed request for accommodation, I was handed at about 3:00 on the 23rd from the Vice President of the Association,** and then an *hour later* I got a call from the President of the Association saying that she was resigning from the position (*emphasis added*).

83. CCIU Defendant also confirmed its receipt of the January 23, 2018 ADA Request form

completed by Plaintiff's health care provider; in it's own developed minutes from

Plaintiff's *Loudermill* hearing, albeit the details list an inaccurate date and method of

delivery, as follows:

> The Minutes confirm CCIU Defendant did receive a copy of the form, Did CCIU **receive** information from Ms. Harmer regarding Generalized Anxiety Disorder?  **Yes**, in an email from 1/22/18.  It was not formally addressed by the CCIU..." (Minutes, p. 6).

84. Even Defendant CCIU's own counsel, Mr. Justin Barbetta, admits his knowledge that the

CCIU received the ADA Request form dated January 23, 2018, as **he wrote about it**

multiple times in Briefs that he penned for other judicial forums, as follows:

    a. On February 11, 2019, CCIU Defendant filed a Brief of Intervenor in the

        Commonwealth Court of Pennsylvania (1364 CD 2018) pursuant to Plaintiff's

        appeal to Review the BOR's Decision.  The Brief was undersigned by Mr.

        Barbetta.  Under "**Factual History**", *Mr. Barbetta* writes:

> **A union representative provided the CCIU Human Resources Department with further documentation relating to the Appellant's [Plaintiff's] accommodation requests on January 23, 2018**

        Then, under "Arguments", *Mr. Barbetta* writes:

> Appellant [Plaintiff] chose not to pursue FMLA but **did provide the CCIU with**

**more documentation related to her specific accommodation requests on
January 23, 2018.**

Thereafter, *Mr. Barbetta* writes:

> Appellant [Plaintiff] submitted multiple, specific accommodation requests on or
> about January 10, 2018. The CCIU granted three (3) of the January 10, 2018
> Requests and asked for more information regarding the remaining two (2) requests.
> **Appellant [Plaintiff] provided the CCIU with additional paperwork relating
> to the ADA requests on or about January 23, 2018**; and *within approximately
> one (1) hour* of providing this additional paperwork, the *Association* notifying Mr.
> Strachan that Appellant [Plaintiff] was resigning.

And then again, *Mr. Barbetta* writes:

> Appellant [sic - Association] communicated her resignation to the CCIU within
> approximately one (1) hour of **submitting accommodation requests on January
> 23, 2018**…

One more time, *Mr. Barbetta* writes:

> … of [Plaintiff] **providing further information regarding the [ADA] requests
> to CCIU**…

85. Plaintiff never received a response from Defendant CCIU regarding the submitted ADA

    Request form – and in this Court moves to claim they never even received it at all!

86. PSEA, by and through Mr. Cottom, told Plaintiff she could either take FMLA, resign or be

    terminated, and that if she was terminated she would lose her teaching license. However,

    Defendant Strachan adamantly has insisted in a variety of forums that Defendant CCIU

    was not moving to terminate Plaintiff – that they were, instead, attempting to work within

    the interactive process to accommodate her so that she could continue to work.

87. For some time, Mr. Cottom, had been planting a seed to Plaintiff that Defendant CCIU

    would terminate her if she did not take FMLA or resign – instead of working to secure for

    her the accommodations her health care providers were requesting for her, so that she could

    complete her essential job duties and functions. Thereby, making known his coercive

    tactics to deceive and manipulate Plaintiff, with clear discriminatory animus.

88. Moreover, PSEA, by and through Mr. Cottom and Ms. Moore, told Plaintiff if she took FMLA, she would not be able to student teach, apply for unemployment, or seek other employment. However, given the fact Plaintiff would only need to take FMLA were Defendant CCIU to fail to accommodate her; she could have been eligible to consider all three.

89. In fact, on or about February 7, 2018, Plaintiff did forward to Mr. Cottom a note completed by her primary health care provider that she was indeed **cleared** to student teach. However, this note, Mr. Cottom refused to forward to Defendant CCIU. Further demonstrating his retaliatory intents filled with discriminatory animus.

90. Therefore, due to Mr. Cottom's guidance, Defendant CCIU's failure to accommodate Plaintiff's health conditions and the hostile work environment described above, Plaintiff was presented – by Mr. Cottom – no other tangible option but to resign. Clearly, it was *Mr. Cottom's* intent that Plaintiff resign from her employment.

91. However, it was Plaintiff's intent to work – with reasonable accommodations in place that would provide her the ability to perform the essential functions of her job.

92. Plaintiff did text to Mr. Cottom a resignation of his demanded design. However, it was no resignation that Plaintiff would ever have put forth. Nor, was it ever legally valid. It did not detail any sixty day notice, as required by the statutes and contracts that Plaintiff was bound under. Nor, presented to – or accepted by – Defendant CCIU's Board of Directors; as further required.

93. In fact, the Board only ever considered Plaintiff as being "on leave"; and the arbitrator's opinion and award completely discredits this text as no valid resignation offered by Plaintiff to Defendant CCIU.

94. In hindsight, it became quite clear that Mr. Cottom's sole focus was not on attempting to

address the known hostile and retaliatory environment that Plaintiff was being subjected to – nor to fight for accommodations explicitly because of it. For, shortly before Plaintiff did secure the January 23, 2018 ADA Request form from her health care provider; she did inform Mr. Cottom via text what would be the contents of it. The text exchange included:

| | |
|---|---|
| Mark Cottom: | "Got them. [referring to documents] The note with the amount of time you will be out will be coming tomorrow is that correct?" |
| Lorraine Harmer: | "The note will request wfh [work from home] for a month due to anxiety as induced by hostile work environment… |
| Mark Cottom: | "Ok but don't put anything in there about a hostile work environment. Just put the facts don't make any conclusions that will be done later thank you." |

95. Then as discussed supra, within the hour he called Plaintiff to strong-arm a "resignation" – not the employer, to fight for her accommodations.

96. Immediately thereafter, Defendant CCIU offered to Plaintiff a settlement of two days of pay and two months of health care in exchange for a full and complete waiver.

97. On February 7, 2018, Plaintiff rejected the settlement offer and requested FMLA due to Defendant CCIU's failure to accommodate (by failure to respond to her provided ADA Request form). She provided notification of this request in writing – to Defendant PSEA's Ms. Moore and Ms. Annemarie Dwyer, Esq.; and to Defendant CCIU's Defendant Strachan and his Administrative Assistant.

98. Ms. Moore stated immediately to Plaintiff, "It doesn't matter, they [Defendant CCIU] will just terminate you for job abandonment." And, in fact, they did attempt to do just that.

99. However, the conspiring Defendants made one fatal mistake – Defendant PSEA scheduled a meeting to review her extended settlement offer exactly ten working days out from the day Plaintiff exhausted all of her sick leave (on January 24, 2018) – but Defendants failed to

consider that Plaintiff's working days did not include Mondays.  Therefore, she was not absent from work without reporting for the ten days Defendant Strachan stated it would typically require to move to terminate an employer with job abandonment..

100.    Notwithstanding, the well-laid design of Defendants to conspire – with the union acting itself as the state – were fully exposed.

101.    Defendant Strachan failed to ever reply to Plaintiff's written inquiry about FMLA.

102.    On February 14, 2018, CCIU's management, including Defendants O'Brien, Harper, Strachan, Curley and Linahan, recommended Plaintiff be terminated for, among other things, job abandonment, abuse of sick time she was entitled to use, and failure to timely submit FMLA paperwork (pursuant to their arbitrarily set deadline, which began upon Plaintiff's mere inquiry for the FMLA paperwork in the event she might want to review it with her health care provider).  These charges against Plaintiff were neither themselves legal, as they were not sent from the CCIU Board of Directors, nor certified, as required by Public School Code of 1949.

103.    In addition to being terminated from her employment with CCIU, Plaintiff was also denied other teaching opportunities as a result of Defendants' conduct, including STEM Saturday Opportunities, STEM Integrative Endorsement position, the ability to teach PBL courses, and student teaching opportunities.

104.    Plaintiff was terminated from employment and denied other job opportunities because of her disabilities/perceived disabilities, and in retaliation for requesting accommodations, complaining about sex and disability discrimination, and opposing unlawful conduct. Defendants subjected Plaintiff to a hostile work environment.

105.    On February 15, 2018 – just one day after she was presented with a notice of charges from Defendant CCIU; Plaintiff did submit FMLA documentation to Defendant PSEA's

Ms. Moore.  Ms. Moore failed to ever forward it to Defendant CCIU.  This FMLA Request was for intermittent leave as connected to Plaintiff's Fibromyalgia and L5 Radiculopathy.

106.    On February 19, 2020; Plaintiff did submit FMLA documentation to Ms. Moore, this FMLA Request for Block leave as connected to Plaintiff's Generalized Anxiety Disorder – due to the failure to accommodate and hostile work environment Plaintiff was being subjected to.  Ms. Moore failed to ever forward it to Defendant CCIU.

107.    Therefore, on the night of February 21, 2018 – to ensure compliance with the fifteen-day requirements under the FMLA – Plaintiff did forward to Defendant CCIU the packets for both FMLA Requests.

108.    The recommendation for termination was upheld by Defendant O'Brien and thereby Defendant CCIU on March 5, 2018; despite all of the evidence, arguments, and circumstances presented in Plaintiff's *Loudermill* hearing.  However, even then, the charges were not issued from the CCIU Board of Directors – nor sent by certified mail.

109.    PSEA's discriminatory and retaliatory actions placed a role in the circumstances leading to her termination because PSEA exercised control over her employment decisions and communications with Defendant CCIU.

110.    PSEA failed to fairly represent Plaintiff because of her disabilities, accommodation requests, and complaints of discrimination and conspired with CCIU to terminate her employment – as well demonstrated by their comments that Plaintiff "stop playing the PTSD card", go "back to work" and not consider FMLA because "that's for people who are actually sick".

111.    Toward the end of her employment, PSEA representatives, including Mark Cottom, David Tschachler, Brian Horvat, Shannon Moore, Anne Marie Dwyer, Charlie Brill, and Katie Voye were made aware of Plaintiff's health conditions – and reported concerns about

fraudulent and illegal activities within the operations of BVA, and the negative impacts those

practices would incur against both students and teachers.

112.     From December 2017, Plaintiff asked PSEA to file grievances regarding Defendants'

discrimination, harassment and retaliation; however PSEA ignored her requests – never

grieving any of those matters, to this day.  Instead, PSEA only grieved the termination for her

proper use of her sick days that she was entitled to use – with said grievance signed by

PSEA's own Ms. Shannon Moore.

113.     Even throughout the grievance process, Defendants continue to conspire together to

keep this actions out of the hands of the proper authority, that the CCIU Board of Directors.

For, between the Executive Level Hearing (which was cancelled in tandem by Defendents)

and arbitration – the grievance is procedurally required to go before the Board for a review

and vote.  However, Anne Marie Dwyer, Esq. of PSEA and Mr. John Audi, formerly of

PSEA and now attorney to Defendant CCIU – together agreed to advance the grievance from

the supervisor's denial, directly to arbitration.  Here again, past and present agents of PSEA

moving to conspire together and act as the state.

114.     Even the proffered "Rule 69 Offer of Judgment" against Defendant CCIU did not come

without strings attached including but not limited to: full releases and waivers for Defendant

PSEA and all of it's attorneys, agents, and representatives; that through the hands of

Plaintiff's own PSEA in house counsel, Mr. Canamucio, who would be afforded protections

by the waivers therein – waivers that he himself added into the settlement discussions.

115.     The above are just some examples of the unlawful discrimination, harassment

and retaliation that Plaintiff suffered at the hands of Defendants.

116.     At the time of her termination, Plaintiff was qualified for the positions she was

put out of – and was performing well.  Even during her absences, Plaintiff diligently

responded to all email communications; responsive to her students, their families, her co-workers, and her superiors; clearly demonstrating she did not ever abandoned her job. Moreover, Plaintiff's pursuits with legislators has resulted in the formation of HB2718; intended to hold IUs themselves accountable to attendance and truancy reporting laws for the students they serve – instead of the LEAs.

117. Plaintiff has upheld all of her broader duties as a public servant, and brought fully into the light these matters of great public concern that pertain to the education of youth, and the tax-payer fundings for it.

118. Defendants discriminated against Plaintiff in the terms and conditions of their employment because of her protected characteristics.

119. Defendants retaliated against Plaintiff because she reported or otherwise opposed Defendants' illegal conduct.

120. Defendants subjected Plaintiff to harassment and a hostile work environment based on her protected characteristics.

121. Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

122. Plaintiff claims unlawful constructive and/or unlawful actual discharge.

123. As a direct result of Defendants' unlawful discrimination and retaliation, Plaintiff has suffered ongoing emotional and mental distress. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting conditions – and the development of new conditions including but not limited to Post Traumatic Stress Disorder; diagnosed and attributed to the actions of Defendants, which work environment did – per the testimony of Defendant Linahan herself – cause Plaintiff to become "emotionally fragile".

## CAUSES OF ACTION
## COUNT I
## TITLE VII DISPARATE TREATMENT
## 42 U.S.C. § 2000e-2

### Plaintiff v. Defendants CCIU and PSEA

124.    Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

125.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

126.    Title VII further provides that "un unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

127.    Defendants engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions, training and privileges of employment because of her sex.

128.    Defendants subjected Plaintiff to adverse tangible employment actions—defined as significant changes in Plaintiff's employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in her employment benefits.

129.    Plaintiff's protected characteristics played a determinative factor in Defendants' decisions.

130.    Defendants cannot show any legitimate nondiscriminatory reasons for their

employment practices and any reasons proffered by Defendants for their actions against Plaintiff are pretextual and can readily be disbelieved.

131. Alternatively, Plaintiff' protected status played a motivating part in Defendants' decisions even if other factors may also have motivated its actions against Plaintiff.

132. Defendants acted with the intent to discriminate.

133. Defendants acted upon a continuing course of conduct.

134. As a result of Defendants' violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendants and prays for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiff is entitled.

**COUNT II**
**TITLE VII HOSTILE WORK**
**ENVIRONMENT 42 U.S.C. § 2000e-2**

**Plaintiff v. Defendants CCIU and PSEA**

135. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

136. Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the Plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the

Plaintiff's employment. <u>Harris v. Forklift Systems</u>, 510 U.S. 17, 21 (1993).

137.     An employer is strictly liable for supervisor harassment that "culminates in a

tangible employment action, such as discharge, demotion, or undesirable reassignment."

<u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998).

138.     Respondent superior liability for the acts of non-supervisory employees exists where

"the defendant knew or should have known of the harassment and failed to take prompt

remedial action. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990).

139.     Employer liability for co-worker harassment also exists where "the employer failed

to provide a reasonable avenue for complaint." <u>Huston v. Procter & Gamble Paper Prods.

Corp.</u>, 568 F.3d 100, 105 (3d Cir. 2009).

140.     The Third Circuit has held that the retaliation provision of Title VII "can be offended

by harassment that is severe or pervasive enough to create a hostile work environment."

<u>Jensen v. Potter</u>, 435 F.3d 444, 446 (3d Cir. 2006).

141.     Here, Defendants' conduct occurred because of Plaintiff's legally protected

characteristics and was severe or pervasive enough to make a reasonable person of the

same legally protected classes believe that the conditions of employment were altered and that

the working environment was intimidating, hostile or abusive.

142.     The harassing conduct directly refers to Plaintiff's protected traits.

143.     Defendants delegated to Plaintiff's supervisors the authority to control the work

environment and they abused that authority to create a hostile work environment.

144.     Harassing conduct filled the environment of Plaintiff's work area.

145.     Defendants knew that the harassing conduct filled Plaintiff's work environment.

146.     Harassing conduct occurred daily.

147.     Harassing conduct caused Plaintiff to sustain severe emotional distress resulting

in physical illness and serious psychological sequelae.

148.     Plaintiff subjectively regarded the harassing conduct as unwelcome and unwanted and objectively opposed the conduct.

149.     The conduct was both severe and pervasive.

150.     The conduct was physically threatening and humiliating.

151.     The conduct unreasonably interfered with Plaintiff's work performance.

152.     The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

153.     Defendants provided a futile avenue for complaint.

154.     Defendants retaliated against Plaintiff for her complaints.

155.     Defendants acted upon a continuing course of conduct.

156.     As a result of Defendants' violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendants and prays for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiff is entitled.

**COUNT III**
**TITLE VII RETALIATION**
**42 U.S.C. § 2000e-3**

**Plaintiff v. Defendants CCIU and PSEA**

157.     Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

158.     Title VII protects employees from retaliation for attempting to exercise their rights under the Act:

> 42 U.S.C. § 2000e-3. Other unlawful employment practices
>
> (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

159.     The Supreme Court in Burlington v. N. & S.F. Ry. V. White, 548 U.S. 53, 68 (2006) held that a cause of action for retaliation under Title VII lies whenever the employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

160.     Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

161.     "[A] Plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[she] was acting under a good faith, reasonable belief that a violation existed.'" Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by

Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995).

162.    An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.")

163.    Here, Defendants discriminated against Plaintiff because of her protected activity under Title VII.

164.    Plaintiff was acting under a reasonable, good faith belief that her right to be free from discrimination on the basis of sex was violated.

165.    Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

166.    There was a causal connection between Defendants' materially adverse actions and Plaintiff's protected activity.

167.    Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

168.    Defendants acted upon a continuing course of conduct.

169.    Plaintiff will rely on a broad array of evidence to demonstrate a causal link between her protected activity and Defendants' actions taken against her, such as the unusually-suggestive proximity in time between events, as well as Defendants' antagonism and change in demeanor toward Plaintiff after Defendants became aware of Plaintiff's protected activity.

170.    As a result of Defendants' violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience,

mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendants and prays for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiff is entitled.

**<u>COUNT IV</u>**
**ADA DISABILITY DISCRIMINATION**
**42 U.S.C. §§ 12101 et seq.**

**<u>Plaintiff v. Defendants CCIU and PSEA</u>**

171.     Plaintiff repeats and realleges every allegation made in the above paragraphs of this complaint.

172.     Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

173.     Under the <u>McDonnell Douglas</u> burden-shifting analysis, Plaintiff must establish a *prima facie* case for discrimination, namely that she (1) has a disability, (2) is a qualified individual, and (3) has suffered and adverse employment action (4) under circumstances giving rise to an inference of discrimination. <u>Turner v. Hershey Chocolate USA</u>, 440 F.3d

604, 611 (3d Cir. 2006).

174.     Furthermore, it is well-settled law that, under the ADA, employers have an
obligation to provide a reasonable accommodation for a disabled employee and that the
failure to provide a reasonable accommodation to an employee's known disability is a
form of discrimination. 42 U.S.C. § 12112(b)(5)(A).

175.     It is undisputed that (1) Plaintiff's aforementioned diagnoses qualify as
disabilities; (2) Plaintiff's experience and performance establish she was qualified; and
(3) Plaintiff was terminated (4) a short time after requesting a reasonable accommodation
related to the above-mentioned diagnoses.

176.     Defendants cannot show a legitimate nondiscriminatory reason for their actions
and any reasons proffered by Defendants for terminating Plaintiff's employment are
pretextual and can readily be disbelieved.

177.     Defendants engaged in an unlawful discriminatory practice by discriminating and
retaliating against Plaintiff because of her disability and refusing to provide Plaintiff with a
reasonable accommodation.

178.     Because of Defendants' violation of the ADA, Plaintiff has suffered damages,
including, but not limited to: past and future lost wages, mental pain and suffering;
humiliation; emotional distress; diminishment of career opportunity; harm to his business
reputation; loss of self-esteem; disruption to his family life; and other harm, pain and
suffering, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages,
including past and future damages for pay, bonuses, personal days, overtime, benefits, and
emotional distress; consequential damages; punitive damages; attorneys' fees; expert witness

fees; costs of suit; interest; and all other relief deemed equitable and just.

## COUNT V
## FMLA INTERFERENCE
## 29 U.S.C. § 2615(a)(1)

### Plaintiff v. Defendants CCIU

179. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

180. The FMLA provides eligible employees of covered employers with up to 12 workweeks of unpaid, job protected leave in a 12-month period for, specified health and caregiving reasons, including a serious health condition that makes the employee unable to perform the essential functions of her job, as well as pregnancy and caring for a new child. 29 U.S.C. §§ 2601 et seq.

181. A covered employer must provide FMLA benefits and protections to eligible employees and comply with their responsibilities under the FMLA and its regulations at 29 C.F.R. part 825.

182. At all relevant times, Plaintiff was an eligible employee of a covered employer with a qualifying medical condition and/or caregiving reason entitling her to the protections of the FMLA.

183. Defendants violated the FMLA by interfering with, restraining and/or denying Plaintiff's rights under the FMLA by, *inter alia*:

   a. Failing to comply with the general notice requirements under the FMLA;

   b. Failing to comply with the eligibility notice requirements under the FMLA;

   c. Failing to comply with the rights and responsibilities notice requirements under the FMLA;

   d. Failing to comply with the designation notice requirements under the FMLA;

e.  Failing to provide notice of a fitness-for-duty certification with the designation notice as required by the FMLA;

f.  Failing to continue to contribute to Plaintiff's health benefits while she was placed on involuntary medical leave;

g.  Discharging and/or constructively discharging, suspending and/or disciplining Plaintiff notwithstanding that Plaintiff was fit to perform their duties and return to work at the end of her FMLA leave;

h.  Retaliating against Plaintiff for asking for attempting to exercise her rights under the FMLA;

i.  Failing to provide Plaintiff with the proper FMLA forms and/or medical certifications;

j.  Failing to supervise and/or train its employees and supervisors on compliance with the provisions of the FMLA;

k.  Failing to have in place proper FMLA policies, procedures and compliance; and/or

l.  Otherwise violating the FMLA.

184.  Defendants' violations of the FMLA were grossly negligent and/or willful.

185.  As a direct and proximate cause of Defendants' willful violations of the FMLA, Defendants are liable for Plaintiff's compensation and benefits lost by reason of the above violations, for other actual monetary losses sustained as a direct result of the Defendants' violations, and for appropriate equitable or other relief tailored to the harm suffered by Plaintiff. See 29 CFR 825.300 (e).

**WHEREFORE**, Plaintiff demands judgment against Defendants and prays for the following relief: (1) an award of compensatory damages in an amount consistent with the FMLA; (2) an award of reasonable attorneys' fees and costs of this action in accordance with the FMLA; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an award of liquidated damages in accordance with the FMLA; (5) an adjudication and declaration that Defendants'

conduct as set forth herein is in violation of the FMLA; and (6) all additional general and equitable relief to which Plaintiff is entitled.

<strong><u>COUNT VI<br>FMLA<br>RETALIATION<br>29 U.S.C. §<br>2615(a)(2)</u></strong>

<strong><u>Plaintiff v. Defendants CCIU</u></strong>

186.    Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

187.    The FMLA protects employees from retaliation.

188.    Defendants violated the FMLA by retaliating and discriminating against Plaintiff for exercising her rights under the FMLA by, *inter alia*:

m.  Failing to continue to contribute to Plaintiff's health benefits while she was placed on involuntary medical leave;

n.  Discharging and/or constructively discharging, suspending and/or disciplining Plaintiff notwithstanding that Plaintiff was fit to perform her duties and return to work at the end of her FMLA leave;

o.  Retaliating against Plaintiff for attempting to exercise her rights under the FMLA;

p.  Failing to supervise and/or train its employees and supervisors on compliance with the provisions of the FMLA;

q.  Failing to have in place proper FMLA policies, procedures and compliance; and,

r.  Otherwise violating the FMLA.

189.    Defendants' violations of the FMLA were grossly negligent and/or willful.

190.    As a direct and proximate cause of Defendants' willful violations of the FMLA, Defendants are liable for Plaintiff's compensation and benefits lost by reason of the violations, for other actual monetary losses sustained as a direct result of their violation, and

for appropriate equitable or other relief tailored to the harm suffered by Plaintiff. <u>See</u> 29 CFR 825.300 (e).

**WHEREFORE**, Plaintiff demands judgment against Defendants and prays for the following relief: (1) an award of compensatory damages in an amount consistent with the FMLA; (2) an award of reasonable attorneys' fees and costs of this action in accordance with the FMLA; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an award of liquidated damages in accordance with the FMLA; (5) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the FMLA; and (6) all additional general and equitable relief to which Plaintiff is entitled.

## <u>COUNT VII</u>
## DISPARATE TREATMENT IN VIOLATION OF EQUAL PROTECTION CLAUSE
## 42 U.S.C. § 1983

### <u>Plaintiff v. ALL Defendants</u>

191.     Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

192.     The Fourteenth Amendment to the United States Constitution protects persons from being subjected to discrimination, by persons acting under color of state law, on the basis of a protected class (e.g., sex). U.S. Const. amend. XIV.

193.     Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress

applicable exclusively to the District of Columbia shall be considered
to be a statute of the District of Columbia.

42 U.S.C. § 1983.

194.     Section 1983 provides a cause of action for unconstitutional employment

discrimination by both employers and individuals, so long as the Plaintiff shows that the

defendant acted under color of state law. See Fitzgerald v. Barnstable School Committee,

129 S. Ct. 788, 796 (2009) ("The Equal Protection Clause reaches only state actors, but §

1983 equal protection claims may be brought against individuals as well as municipalities

and certain other state entities."); see also Andrews v. City of Philadelphia, 895 F.2d

1469, 1478 (3d Cir. 1990) ("Liciardello and Doyle objectively should have known the

applicable legal standard, and thus are not protected by qualified immunity in treating, or

allowing their subordinates to treat, female employees differently on the basis of gender in

their work environment.").

195.     Defendants violated Section 1983 by intentionally discriminating against Plaintiff in

a serious tangible way with respect to her compensation, terms, conditions or privileges of

employment.

196.     Plaintiff's protected characteristics (sex and protected activity) were a

determinative or motivating factor in Defendants' employment actions.

197.     Defendants cannot show any legitimate nondiscriminatory reason for their

employment practices and any reasons proffered by the Defendants for their actions

against Plaintiff are pretextual and can readily be disbelieved.

198.     Plaintiff's protected status played a motivating part in the Defendants' decisions

even if other factors may also have motivated Defendants' actions against Plaintiff.

199.     Defendants acted under color of state law.

200.     Defendants acted with the intent to discriminate.

201. Defendants acted upon a continuing course of conduct.

202. Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights and as a result there should be an award of punitive damages against Defendants.

203. As a result of Defendants' violations of Plaintiff's Equal Protection rights, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation,

emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and prays for the following relief: (1) actual damages; (2) compensatory damages in an amount consistent with Section 1983; (3) reasonable attorneys' fees in accordance with Section 1983; (4) litigation costs in accordance with Section 1983; (5) pre- and post-judgment interest as further allowed by law; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of Section 1983; (7) punitive damages in accordance with Section 1983; (8) front pay in accordance with Section 1983; and (9) all additional general and equitable relief to which Plaintiff is entitled.

## <u>COUNT VIII</u>
## HOSTILE WORK ENVIRONMENT IN VIOLATION OF EQUAL PROTECTION CLAUSE 42 U.S.C. § 1983

### <u>Plaintiff v. All Defendants</u>

204. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

205. The Third Circuit has made it clear that a hostile work environment based on sex can

give rise to an equal protection claim. <u>See</u>, <u>e.g.</u>, <u>Andrews v. City of Philadelphia</u>, 895

F.2d 1469, 1478-79 (3d Cir. 1990) (upholding verdict for Plaintiff on sexual harassment

claims against city employees, based on conclusion that evidence supported finding of

purposeful discrimination); <u>see</u> <u>also</u> <u>Bohen v. City of East Chicago, Ind.</u>, 799 F.2d 1180,

1185 (7th Cir. 1986); Cheryl L. Anderson, <u>"Nothing Personal:" Individual Liability under</u>

<u>42 U.S.C. § 1983 for Sexual Harassment as an Equal Protection Claim</u>, 19 BERKELEY

J. EMP. & LAB. L. 60, 80 (1998) (citing <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57

(1986) as support for argument that sex harassment can satisfy the intentional

discrimination requirement for equal protection claims).

206.     The Third Circuit has also made clear that a hostile work environment equal

protection claim can be made even if the defendant is not the Plaintiff's supervisor. <u>See</u>

<u>Bonenberger v. Plymouth Twp.</u>, 132 F.3d 20, 24 (3d Cir. 1997).

207.     Additionally, a Plaintiff can show an equal protection violation by a supervisor

who fails properly to address harassment by the Plaintiff's co-workers. <u>Andrews</u>, 895

F.2d at 1479.

208.     Defendants violated Section 1983 by subjecting Plaintiff to hostile work

environment harassment based on sex.

209.     Defendants' conduct was not welcomed by Plaintiff.

210.     Defendants' conduct was so severe or pervasive that a reasonable person in

Plaintiff's position would find the work environment to be hostile or abusive.

211.     Plaintiff believed her work environment was hostile or abusive as a result of

Defendants' conduct.

212.     As a result of the hostile work environment, Plaintiff suffered a "tangible

employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

213.     Defendants failed to exercise reasonable care to prevent hostile work environment harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of sex, failing to fully communicate the policy to their employees, failing to provide a reasonable way for Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiff.

214.     Defendants acted under color of state law.

215.     Defendants acted with the intent to discriminate.

216.     Defendants acted upon a continuing course of conduct.

217.     Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights and as a result there should be an award of punitive damages against Defendants.

218.     As a result of Defendants' violations of Plaintiff's Equal Protection rights, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and prays for the following relief: (1) actual damages; (2) compensatory damages in an amount consistent with Section 1983; (3) reasonable attorneys' fees in accordance with Section 1983; (4) litigation costs in accordance with

Section 1983; (5) pre- and post-judgment interest as further allowed by law;

(6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of

Section 1983; (7) punitive damages in accordance with Section 1983; (8) front pay in accordance

with Section 1983; and (9) all additional general and equitable relief to which Plaintiff is entitled.

## COUNT IX
## RETALIATION IN VIOLATION OF PETITION
## CLAUSE 42 U.S.C. § 1983

### Plaintiff v. All Defendants

219.     Plaintiff incorporates by reference each and every allegation made in the above

paragraphs of this complaint.

220.     The First Amendment gives persons the right to petition the Government for a

redress of grievances. U.S. Const. amend. I.

221.     "[R]etaliation by a government employer for a public employee's exercise of the

right of access to the courts may implicate the protections of the Petition Clause." Borough

of Duryea v. Guarnieri, 131 S. Ct. 2488, 2494 (2011); see also Mack v. Warden

Loretto FCI, 839 F.3d 286 (3d Cir. 2016) (holding that an inmate's oral grievance is

protected under the Petition Clause).

222.     To be protected under the First Amendment, speech by a government employee

"must be on a matter of public concern, and the employee's interest in expressing herself on

this matter must not be outweighed by any injury the speech could cause to 'the interest of

the State, as an employer, in promoting the efficiency of the public services it performs

through its employees.'" Waters v. Churchill, 511 U.S. 661, 668 (1994).

223.     At all relevant times, Defendants received (and still receive) federal and/or state

funding and/or subsidies.

224.	To be protected under the First Amendment, speech by a government employee "must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Waters v. Churchill, 511 U.S. 661, 668 (1994).

225.	Here, Plaintiff engaged in activity that was protected by the First Amendment's Petition Clause.

226.	While working for Defendants, Plaintiff reported (verbally and in writing) what she reasonably believed to be violations of various regulations under state and federal law, codes, and/or regulations.

227.	Defendants' management never properly investigated or resolved Plaintiff's concerns and instead retaliated against Plaintiff for raising said complaints.

228.	Following Plaintiff's complaints regarding what she reasonably believed to be violations of state law, codes and/or regulations, Plaintiff's work environment became increasingly hostile and she was subjected to multiple threats and other discriminatory/retaliatory adverse actions regarding her compensation, terms, conditions, location, and/or privileges of her employment with Defendants.

229.	Plaintiff's speech was on a matter of public concern.

230.	Defendants took materially adverse employment actions against Plaintiff for engaging in protected activity.

231.	Plaintiff's protected activity was a substantial or motivating factor in Defendants' decisions.

232.	Defendants cannot show any legitimate nondiscriminatory reason for their

employment practices and any reasons proffered by Defendants for their actions against

Plaintiff is pretextual and can readily be disbelieved.

233.     Defendants acted upon a continuing course of conduct.

234.     Defendants acted with malice or reckless indifference to Plaintiff's federally

protected rights and as a result there should be an award of punitive damages against

Defendants.

235.     As a result of Defendants' violations of Plaintiff's Free Speech rights, Plaintiff has

suffered damages, including, but not limited to: past and future lost wages, pain and

suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional

distress, reputational harm, diminishment of career opportunities, and other harm, both

tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and pray for the following

relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees;

(4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that

Defendants' conduct as set forth herein is in violation of the First Amendment; (7) punitive damages;

(8) front pay; and (9) all additional general and equitable relief to which Plaintiff is entitled.

## COUNT X
## PHRA DISCRIMINATION
## 43 P.S. §§ 951-963

### Plaintiff v. All Defendants

236.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

237.     The PHRA § 955 provides that it shall be an unlawful discriminatory practice: "(a)

For any employer because of the race, color, religious creed, ancestry, age, sex, national

origin or non-job related handicap or disability or the use of a guide or support animal

because of the blindness, deafness or physical handicap of any individual or independent

contractor, to refuse to hire or employ or contract with, or to bar or to discharge from

employment such individual or independent contractor, or to otherwise discriminate

against such individual or independent contractor with respect to

compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the

individual or independent contractor is the best able and most competent to perform the

services required."

238.     Defendants engaged in an unlawful discriminatory practice by discriminating

against the Plaintiff because of her sex/gender and by subjecting Plaintiff to a hostile

work environment.

239.     Plaintiff hereby makes a claim against Defendants under all of the applicable

paragraphs of the PHRA § 955.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and prays for the

following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees;

(4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that

Defendants' conduct as set forth herein is in violation of the law; (7) punitive damages; (8) and all

additional general and equitable relief to which Plaintiff is entitled.

## COUNT XI
## PHRA
## RETALIATION
### 43 P.S. §§ 951-963

### Plaintiff v. All Defendants

240.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this Complaint.

241.     PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: " For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

242.     Defendants engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of her employer.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and prays for the following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the law; (7) punitive damages; (8) and all additional general and equitable relief to which Plaintiff is entitled.

<u>**COUNT XII**</u>
**PHRA AIDING AND ABETTING**
**43 P.S. §§ 951-963**

<u>**Plaintiff v. Defendants**</u>

243.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

244.     PHRA § 955(e) provides that it shall be an unlawful discriminatory practice: "for any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the

provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."

245.    Defendants engaged in an unlawful discriminatory practice in violation of PHRA §955(e) by committing, aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and prays for the following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the law; (7) punitive damages; (8) and all additional general and equitable relief to which Plaintiff is entitled.

## COUNT XIII
## PENNSYLVANIA WHISTLEBLOWER RETALIATION
## 43 P.S. § 1423

### Plaintiff v. CCIU Defendants

246.    Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

247.    The PWL provides, " No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423(a).n

248.    "Wrongdoing includes not only violations of statutes or regulations that are of the type that the employer is charged to enforce, but violations of any federal or state statute or

regulation." Golaschevsky v. Dep't of Envtl. Protection, 554 Pa. 157, 162 (1998) citing 43 P.S. § 1422.

249.     In order to make out a retaliation case under the PWL, a Plaintiff must plead: (1) wrongdoing and (2) a causal connection between the report of wrongdoing and adverse employment action. McAndrew v. Bucks County Bd. Of Com'rs, 982 F. Supp. 2d 491, 503 (E.D. Pa. 2013).

250.     In analyzing whether the motive for an adverse employment action is retaliatory, courts in the Third Circuit have looked at two factors: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." Hussein v. UPMC Mercy Hosp., 466 Fed.Appx. 108, 112 (3d Cir.2012).

251.     Defendants are a "public body" for purposes of the PWL.

252.     The PWL makes it unlawful for a public employer to: discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer.

253.     While working for Defendants, Plaintiff reported (verbally and in writing) what she reasonably believed to be violations of various regulations under state and federal law, codes, and/or regulations.

254.     Defendants' management never properly investigated or resolved Plaintiff's concerns and instead retaliated against Plaintiff for raising said complaints.

255. Following Plaintiff's complaints regarding what she reasonably believed to be violations of state law, codes and/or regulations, Plaintiff's work environment became increasingly hostile and she was subjected to multiple threats and other discriminatory/retaliatory adverse actions regarding her compensation, terms, conditions, location, and/or privileges of her employment with Defendants.

256. The above-described actions taken against Plaintiff constitute violations of the PWL.

257. As a result of Defendants' violations of the PWL, Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against all Defendants and pray for the following relief: (1) actual damages; (2) compensatory damages; (3) reasonable attorneys' fees; (4) litigation costs; (5) pre- and post-judgment interest; (6) an adjudication and declaration that Defendants' conduct as set forth herein is in violation of the PWL; (7) reinstatement; (8) front pay; and (9) all additional general and equitable relief to which Plaintiff is entitled.

## COUNT XIV
## DECLARATORY RELIEF
## ALLEGATIONS

258. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

259. A present and actual controversy exists between Plaintiff and Defendants

concerning their rights and respective duties.

260.     Plaintiff contends Defendants violated her rights as complained of herein.

261.     Plaintiff is informed and believe that Defendants deny these allegations.

262.     Declaratory relief is therefore necessary and appropriate.

**WHEREFORE,** Plaintiff seeks a judicial declaration of the rights and duties of

the respective parties.

**COUNT XV**
**INJUNCTIVE RELIEF**
**ALLEGATIONS**

263.     Plaintiff incorporates by reference each and every allegation made in the

above paragraphs of this complaint.

264.     No plain, adequate, or complete remedy at law is available to Plaintiff to

redress the wrongs addressed herein.

265.     If this Court does not grant the injunctive relief sought, Plaintiff

will be irreparably harmed.

**WHEREFORE,** Plaintiff seeks an order enjoining Defendants from engaging in

the unlawful acts complained of herein.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby

demands a trial by jury on all issues raised by this complaint.

Respectfully submitted,

 /s/  *Lorraine Harmer*    .
Plaintiff, *pro se*

Dated:  September 30, 2020