CHESTER COUNTY INTERMEDIATE )
UNIT #24                     )        BOM Case No. 2018-1010
                             )        Lorraine Harmer Dismissal
                             )
        and                  )
                             )        Opinion and Award
                             )
CHESTER COUNTY INTERMEDIATE  )
UNIT EDUCATION ASSOCIATION   )        Issued:
PSEA/NEA                     )          March 3, 2020


## BACKGROUND

        This grievance was filed on March 19, 2018 to
challenge Employer's (CCIU's) suspension and Executive Director
Dr. Joseph O'Brien's recommendation of the termination of
Grievant's employment as being without just cause and in
violation of the parties' collective bargaining agreement (CBA).
The face of the grievance states that Grievant declines her
right under the Public School Code to request and appear at a
hearing before the Board of School Directors (J-2).  The
grievance was submitted to arbitration pursuant to Appendix B of
the CBA.  On September 17, 2019, an arbitration hearing was
held, where all parties had full opportunity to present evidence
and argument.  A transcript of the proceedings was taken, and
the parties submitted post-hearing briefs on December 18, 2019.

        The CBA under which this grievance arose is effective
from August 15, 2017 to August 14, 2020.  Article VII, EXISTING
POLICIES AND PRACTICES, includes the following provision:


        O.  Due Process

            1.  The Board and the Association
                expressly agree that the Board and
                the Administration shall not have
                the right to discipline a tenured
                professional employee except for
                cause.

            2.  Disciplinary actions which the Board
                or Administration may take, provided
                that cause exists, shall include,

but shall not be limited to, oral
reprimand, written warning, written
reprimand, suspension from
employment duties without pay,
demotion, as defined in the School
Code, unsatisfactory rating, or
dismissal for cause.

3.  No tenured professional employee
    shall be dismissed unless the
    Executive Director shall recommend
    dismissal and a two-thirds (2/3)
    majority of the Board shall vote for
    dismissal at a public meeting of the
    Board.

4.  In determining whether cause exists
    for dismissal, that term shall
    specifically include, but shall not
    be limited to, just cause, or any
    conduct or action by a tenured
    professional employee which would
    lawfully provide a proper basis for
    dismissal pursuant to Section 1122
    of the Public School Code of 1949
    and interpretations thereof by
    Pennsylvania courts and/or the
    Secretary of Education.

5.  In the event that the Executive
    Director shall recommend to the
    Board that a tenured professional
    employee be dismissed, that
    recommendation and the reasons
    therefore shall be transmitted in
    writing to the Board President and
    the employee involved.  Within ten
    days after receipt by the employee
    involved of such recommendation,
    he/she shall elect in writing
    whether he/she elects to proceed
    under the Sections 1121 through 1132

of the School Code or in accordance
with the grievance procedure set
forth in this Agreement, beginning
at Step III.  Tenured professional
employees whose dismissal for cause
has been recommended may follow the
grievance procedure or request a
hearing pursuant to Sections 1121
through 1132 of the School Code, but
not both.

6. The parties hereto agree that the
dismissal or non-renewal of a
temporary professional employee
shall not be grieved beyond the
executive director level or
arbitrated.

7. This section shall apply to
disciplinary actions only and shall
not apply to retirements,
suspensions, transfers, demotions,
abandonment of contract,
resignation, or other changes in
tenured professional employee status
which are initiated by the employee,
or which are initiated by the Board
for reasons other than for the
purpose of discipline of an employee
for cause.

(J-1)


Section 1121 of the Pennsylvania School Code includes
the following language:

IT IS FURTHER AGREED by the parties hereto
that none of the provisions of this act may
be waived either orally or in writing, and
that this contract shall continue in force
year after year, with the right of the board

of school directors (or board of public
education) to increase the compensation over
the compensation herein stated, from time to
time, as may be provided under the
provisions and proper operation of the
established salary schedule, if any, for the
school district, subject to the provisions
of law, without invalidating any other
provision of this contract, *unless
terminated by the professional employe by
written resignation presented sixty (60)
days before resignation becomes effective*,
or by the board of school directors (or
board of public education) by official
written notice presented to the professional
employe...."

[24.PS §11-1121(c); Emphasis Added]

At arbitration, the Association stated that this
grievance brings claims that CCIU violated the CBA and the
School Code, and it makes no claims under the Americans with
Disabilities Act (ADA), the Family and Medical Leave Act (FMLA),
any statues prohibiting discrimination, or any other state or
federal statutes.  Thus, in order to avoid any argument that
through these proceedings Grievant has waived her ability to
pursue such statutory claims in a judicial forum, the
Association is not asking in this proceeding for any factual
findings regarding Grievant's medical condition or legal
conclusions about CCIU's compliance with any of those statutes
(TR. 22-23).

For purposes of the present decision, the testimony
and documentary evidence may be summarized as follows.

Grievant was employed by CCIU as a mathematics teacher
in its Brandywine Virtual Academy (BVA) from the 2013-2014
school year to the dismissal now in issue.  She also has served
as a course developer and facilitator with CCIU's Innovative
Educational Services Division (IES).  Before the events in
issue, she had a clean disciplinary record, and she received the

highest rating -- "distinguished" -- in her two most recent
evaluations (A-6, A-7).

        The events that resulted in the present grievance
began in January 2018.  Grievant testified that she has a number
of medical conditions, some for years and some more recently
(TR. 131).  She used a combination of sick days, personal days,
and compensatory time in order to be excused from work on the
work days from January 11 to January 24, 2018 (A-9 through A-
17).  CCIU accepted medical documentation she provided related
to some of these days (A-14).[1]  There is no dispute that Grievant
satisfied the requirements for reporting off during that period
and that she was entitled to all the benefits she used.  Her
last day at work was January 10, 2018, and the last day she was
paid for was January 24, 2018 (ER-6; ER-7).

        On January 19, 2018, Grievant asked Benefits Analyst
Danielle Mikolosko for information about FMLA leave, which
Mikolosko provided that day (ER-6).  In Mikolosko's email
response, she told Grievant to have her physician complete the
"certification of health care provider form" to be returned to
her by February 3, 2018.  She also noted that Grievant's
"medical leave of absence...began on January 19, 2018" (A-2).
The same day, Grievant informed Mikolosko by email that she had
not begun a medical leave but only had requested the FMLA
paperwork to "discuss the topic" with her doctor at an
appointment on January 22, 2018 (A-3).[2]  Grievant returned the
FMLA paperwork to CCIU on February 22, 2018.

        On January 23, 2018, Grievant sent a number of email
messages.  She wrote to Director of IES Noreen O'Neill and

_____

[1] Grievant unsuccessfully requested to work from home on some of
these days, and she also submitted several disability
accommodation requests.  The Cyber Faculty Handbook states:
"Work from Home (WFH) is a privilege afforded to BVA
professional staff at the discretion of the academic department
and on a case by case basis" (A-8).

[2] The evidence shows that from January 20 to 22, 2018, Grievant
continued to explore options including FMLA and other leave, as
well as accommodations (ER-6).

Director of Educational Leadership Services Niki Harvey to express her gratitude for opportunities they had provided her and to inform them:  "Sadly, I have decided to resign from my role as BVA Math Teacher" and "I have decided to accept a flexible...opportunity" with another employer (ER-4).  She also wrote to her supervisor, Supervisor of Online Learning for the BVA Charles (Chip) Harper, to ask if it would be acceptable for her to write a goodbye note to her students and families and to her supervisor's supervisor, Director of Communications and Learning Solutions Mary Jeanne Curley, to ask if it would be acceptable for her to send a goodbye note to her colleagues (ER-5).  Harper responded that same day, telling Grievant her access to CCIU systems such as email will be restricted "[b]ecause you are no longer an active CCIU employee" (ER-5).  In Curley's January 24, 2018 response, she consented to Grievant's request but informed her that her access to CCIU systems would be disabled "since your resignation is pending" (ER-5).  Grievant's access to the CCIU systems was ended on January 24, 2018, and she turned over her laptop computer that same day.

Curley testified that she first heard that Grievant had resigned when Director of Human Resources Iain Strachan told her on January 23, 2018, and she first learned that Grievant did not resign when Strachan told her on February 7, 2018 (TR. 108-109).

The parties agree that for a period beginning on about January 24, 2018, CCIU was engaged in discussions with Grievant about a settlement agreement CCIU generated.  According to Strachan, CCIU was motivated to achieve such an agreement for the purpose of achieving a legal waiver in order to avoid costs for legal services (TR. 172-173).  He added that Grievant should not have been paid for January 24, 2018 because she resigned on January 23, 2018, and the only reason she was paid for the 24th was because the parties agreed to that as an initial term of a settlement (TR. 174-175).  No further evidence regarding settlement discussions between the parties is included in the present evidentiary record.

On February 7, 2018, Grievant emailed Strachan to inform him that:  "I had a follow up meeting with the union earlier today to discuss status of employment and possibility of

taking FMLA as I am still unable to return to BVA due to health conditions" (A-18).[3]  On February 11, 2018, Grievant emailed a member of IES, Diane Thomson, copied to O'Neill and Harvey, to say:  "My resignation from BVA has been rescinded and discussions regarding employment status are ongoing" (A-5).  On February 13, 2018, O'Neill informed Grievant:  "I checked with HR and was informed your employment status is currently undetermined" (A-5).

        On February 14, 2018, CCIU Executive Director Joseph O'Brien sent a letter to Grievant notifying her that he was considering recommending her dismissal to the CCIU Board of Directors in accordance with Section 1122 of the Public School Code of 1949, based on the charge of "abandonment of position," which he specified in five proposed charges (J-3).  A Loudermill hearing held on February 23, 2018 was attended by Dr. O'Brien, other members of the administration, Grievant, and her Association representative.  In part, the minutes of this hearing reflect that:  after the Association President told Strachan on January 23, 2018 that Grievant was resigning, Strachan suggested to him that Grievant enter into a settlement agreement; after checking with Grievant he told Strachan that she was interested in such an agreement; and on February 7, 2018, an Association representative told Strachan Grievant had decided not to sign the proposed settlement agreement.  At this hearing, there also was discussion about Grievant resigning. Dr. O'Brien remarked that it was unfortunate that the new job Grievant took was false, but he stated that "when she wrote her letter of resignation, she did intend to leave the CCIU."  On Grievant's behalf, her Association representative stated:  that Grievant had been "pursuing a resignation, but rescinded that request"; that she had not abandoned her job; that she wants to continue to work, and that it is her "intent to return to work at the CCIU" (ER-2).

        At arbitration, Grievant acknowledged that she stated in the January 23, 2018 email detailed above that she was resigning, but she testified, "I said I decided to but, however, I never did" (TR. 164).  She also testified, "I did not submit a

---

[3] Grievant testified that between January 24 and February 7, 2018, she had been absent for seven days (TR. 155).

formal note or resignation. I did not -- I did not intend to resign" (TR. 163). She testified that she stopped putting in for administrative leave after January 24, 2018 because she had no more leave available. Regarding the time when she was not coming to work, she was asked whether, in her opinion, CCIU had to ask her to come to work, and she responded:

> A. I was requesting to come to work with accommodations.
>
> Q. Do they have to ask you to come to work?
>
> A. There was no response provided on my accommodation request.
>
> Q. Did you ask -- do they have to ask you to come to work?
>
> A. I was attempting to come to work.
>
> Q. Did you attempt to come to work? Did they lock you out?
>
> A. In a sense, yes, they did.[4]
>
> (TR. 161)

In a March 5, 2018 letter, Dr. O'Brien notified Grievant that at the March 21, 2018 meeting of the CCIU Board of Directors he would recommend that the Board dismiss her from employment as a professional employee, based on:

---

[4] In email correspondence with Communications and Learning Solutions member Kristine Singer about two sick days Grievant had put in to cover January 12 and 16, 2018, Grievant stated in a January 18, 2018 message: "I am doing well and ready to return to work...just waiting for word that I can" (A-11).

> ...your failure to work and your failure to
> report your absences or request a leave of
> absence from January 25 through February 22,
> 2018.  It is also due to written
> communications noting you resigned from
> CCIU.

The letter then sets forth five "key issues."[5]  It also notifies
Grievant that she has a right under the School Code (§24 P.S. 5-
514) to request a hearing before the Board prior to its decision
on her "proposed dismissal," but her failure to request this
hearing by March 14, 2018 will be deemed a waiver of her right
to the hearing.  The letter informs Grievant of the procedures
that will be followed if she requests a hearing, and it
concludes:

> Confirmation of the Board's decision as to
> whether or not you shall be dismissed will
> thereafter be transmitted to you in writing,
> in the form of an adjudication, specifying
> the reasons therefore, if dismissal has been
> deemed warranted and has been approved by a
> vote of a majority of the Board.

> (J-4)

There is no dispute that the proposal for Grievant's
dismissal and the charges against her were not submitted to the
CCIU Board.  At arbitration, Dr. O'Brien was asked if the Board
ever had voted to terminate Grievant's employment, and he
responded:

> No, it has not, nor have I recommended that
> they -- nor did I recommend that they do so.

---

[5] These five key issues will be addressed below.

We were awaiting the results of the
arbitration and grievance.[6]

(TR. 49-50)

In part, the minutes of the October 17, 2018 meeting
of the CCIU Board of Directors reflect the "Approval of
Personnel Actions," including 14 Resignations.  Entry No. 14 of
Nominations shows that effective October 5, 2018, Long-term
Substitute (LTS) and BVA Online Instructor William Brodhag was
hired as an "LTS for employee on leave (Lorraine Harmer)" (A-4).
There is no dispute that Brodhag originally had been hired to
fill in for a teacher who was on leave.  Grievant testified that
Brodhag came in as an LTS for math teacher and department chair
Lisa Miller who was going on maternity leave.  She added "...on
January 10, 2018, I worked with Mr. Brodhead [sic]" (TR. 153-
154).

The evidence also shows that at some point CCIU hired
an outside attorney to conduct an investigation into several
allegations Grievant made against CCIU in a March 20, 2018
Complaint, including that she had been unlawfully terminated.
This attorney's September 17, 2018 Investigatory Report states
that she found no evidence to support any of the allegations
(ER-1).  On October 31, 2018, Grievant appealed the conclusions
of this report, and on November 16, 2018 Dr. O'Brien notified
Grievant that he concurred with the finding that there was no
basis for her complaints (ER-3).

## CCIU Contentions

CCIU contends that Grievant resigned her employment.
If it is found that she had a right to rescind her resignation,
it contends that she voluntarily terminated her position by
abandoning her job; thus, it had just cause to recommend her
dismissal.

---

[6] The present grievance was filed on March 19, 2018.

According to CCIU, the law is clear:  Absence from work, even for a good cause such as illness, may become, through the lapse of an unreasonable amount of time, a voluntary termination, and the burden of keeping an employment relationship alive is on the disabled employee.  Finally, an employee must express a definite intention to abandon his or her contract, and an employer must perform an act acquiescing in the abandonment.  *West Shore School District v. Bowman*, 48 Pa. Cmwlth. 104 (1979), 409 A. 2d 474.

CCIU contends that all those conditions are satisfied in the present case.  Grievant stopped working on January 10, 2018, used all available leave through January 24, 2018, and did not report to work from January 25 through February 14, 2018 without calling in or reporting off.  She abandoned her teaching position mid-year for a one-month period.  Moreover, although Grievant was provided FMLA paperwork on January 19, 2018, she did not submit this paperwork until February 22, 2018, after the deadline for its submission.

Prior to February 22, 2018, the last time Grievant communicated with CCIU was on January 23, 2018, when she sent notification of her intention to resign her employment.  On that date:  she emailed her direct supervisor Chip Harper, copied to CCIU Director of Human Resources Iain Strachan, to ask if it would be acceptable to send a written goodbye to her students and families; she emailed her supervisor's supervisor, Mary Jeanne Curley, to ask if it would be acceptable for her to send a goodbye message to her CCIU colleagues.  The next day, she relinquished her identification, laptop and keys.  Also on January 23, 2018, Grievant emailed two cabinet-level CCIU employees to say she had "decided to resign...as BVA Math Teacher" and had decided to accept another "opportunity as an Administrative Assistant with DXC technology" (ER-4).  In late January, she also sent a text to Association representative Mark Cottom stating, "Mr. Strachan, Please accept this letter as notification of my resignation effective Friday, January 26, 2018" (ER-4).  Subsequently, she informed a different Association representative, David Tschachlor, that the new job had turned out to be a scam.

CCIU acknowledges that, unlike a traditional notice of resignation that is written in a formal letter, Grievant's notification was reported to Strachan by the Association President, but it contends that the evidence leaves no doubt of her intention to quit her job and to make sure CCIU had notice. There is no sound basis on which she could have considered herself to be re-employed simply because she had a change of heart after her new job failed.

CCIU contends that the evidence also shows that it believed Grievant had resigned and acquiesced in the abandonment. On January 23, 2018, Curley notified the technology department that Grievant had resigned from CCIU and directed that her email account be restricted immediately. That same day, Harper informed Grievant that she could not email her students to say goodbye because she no longer was an active employee and no longer had access to the CCIU system. More importantly, CCIU hired a long-term replacement for Grievant. At CCIU, an extended absence is filled with a long-term substitute, and ultimately when it appears that the absence may be forever, the long-term subs are replaced with a permanent hire, and that is what was done in the present case. The bottom line is that a permanent long-term substitute was placed in Grievant's position and, through a great deal of effort, the class had been covered. CCIU stresses that in Grievant's case it did not do what it always does when an employee is taking an unpaid leave, which is to seek authority for the employee to do so with the Board of Education, and it did not fill Grievant's position with a day-to-day substitute.

On these facts, CCIU contends that all elements of voluntary dismissal/job abandonment have been met. Moreover, Grievant has failed to meet her burden of keeping the relationship alive.

CIU also contends that, while voluntary termination has been deemed a stand-alone reason for dismissal of an employee, Grievant's suspension without pay pending a dismissal also meets the traditional just cause analysis. According to CCIU, the evidence indicates an affirmative response for each of the seven tests for just cause looked at by the Commonwealth Court in *International Broth. of Firemen and Oilers, Local 59 v.*

*Township of Falls*, 688 A. 2d 269 (Pa. Cmwlth. 1977).  In line
with that particular analytical framework, CCIU argues the
following:

• CCIU gave Grievant forewarning of the possible consequences
of her conduct in that it is universally understood that
abandoning a job is grounds for dismissal.  In light of the
evidence detailed above, CCIU was within its right to believe
Grievant was gone and had no obligation to bring her back when
after a month of silence she announced she wanted FMLA leave.
She knew she had resigned and knew the consequences of
attempting to surreptitiously rescind her resignation.

• CCIU's rule or order was reasonably related to the orderly,
efficient, and safe operation of its business and the
performance it might properly expect of Grievant.  It is
axiomatic that an employee cannot irregularly report to work at
will and that the employee is obligated to report off from work
and to seek approval for a long-term absence without pay.  If
tolerated, unapproved and unreported absences would make the
educational system fail.

• CCIU made an effort to determine whether Grievant in fact
violated its rule or order.  CCIU worked with Grievant regarding
her requested accommodation and her inquiry about FMLA leave.
By the time she resurfaced after a month to request FMLA leave,
CCIU had accepted her resignation and there was nothing left for
CCIU to do but to respond that she was not entitled to this
leave because she no longer was a CCIU employee.

• CCIU's investigation was conducted fairly and objectively,
after which a notice of the recommended charges was issued and a
Loudermill hearing was held.  Only then was a decision made to
move forward with the job abandonment/voluntary termination
charge.

• CCIU obtained substantial evidence of Grievant's violation.
In fact, this record is filled with evidence that Grievant
abandoned her job.  If Grievant was an employee from January 24,
2018 to February 22, 2018 -- the next time CCIU heard from her
-- she was AWOL.  She did not put in for any leave, call off, or
request any unpaid leave.  Instead, she resigned for another

job, and when that job fell through she deviously attempted to claim that she was still a CCIU employee waiting for FMLA leave to be approved.

• CCIU has applied its rules and penalties evenhandedly to all employees. There is no record evidence that CCIU has treated other similarly situated employees differently than it treated Grievant.

• CCIU contends that the degree of discipline imposed on Grievant was reasonably related to her offense and her work record. Job abandonment not only always has been a dismissible offense, but for a teacher it is morally offensive. Grievant walked out and left the students mid-year without a plan or a teacher in a hard-to-fill position. Clearly her punishment fits the offense.

For all the above reasons, CCIU asks the Arbitrator to deny the grievance and to hold that Grievant's termination as an employee will be left to stand.

## Association Contentions

The Association stresses that it filed the present grievance to challenge Grievant's "dismissal from employment, as without just cause" (J-2). According to the Association, the evidence makes clear that Grievant was involuntarily terminated. For example, CCIU issued a statement of charges against her, after which it conducted a Loudermill hearing. Now CCIU attempts to claim that Grievant voluntarily resigned or otherwise abandoned her position in order to avoid application of the CBA's "just cause" provision, which does not apply to "resignation" or "abandonment of contract" (J-1).

The Association cites judicial precedent which reflects that principles of contract law govern disputes over the completion of a Pennsylvania public employee's resignation from employment. Pennsylvania law requires both the offer and the acceptance of a public school employee's resignation prior to its effectiveness, and neither of these occurred in the

present case.  *See:  Borough of California v. Horner*, 565 A.2d
1250 (Pa. Cmwlth. 2989).

By its express terms, Section 1121 of the Pennsylvania
School Code only recognizes written resignation presented to the
school's governing body at least sixty days prior to the
effective date of resignation [24 P.S. §11-1121(c)].  In the
present case, no offer of resignation was given to CCIU by
Grievant.  Executive Director O'Brien testified that he never
received a written offer of resignation from Grievant and
therefore "didn't pass on something [to the IU's Board of
Directors] that I did not receive" (TR. 58-60).  Dr. O'Brien
testified that he "assumed she left" (TR. 60), and he based his
assumption on innocuous communications in emails Grievant sent
to her supervisor and a few administration members, her return
of her laptop computer, and a statement about resignation that
he claims to have elicited from Grievant during her Loudermill
hearing.  In none of these communications did Grievant purport
to resign or provide an effective date for her resignation.
Also, none of these communications was addressed or sent to Dr.
O'Brien or the CCIU's Board of Directors, and the recipients did
not relay them to the Board.

According to the Association, even if any of these
communications is deemed to have constituted a valid, written
offer of resignation, such an offer was timely rescinded.  Board
meeting minutes from months after the events in issue list
Grievant as an "employee on leave" (ER-4), and, to this day, the
Board has never purported to accept an offer of resignation from
Grievant.  Moreover, in the days after the January 23, 2018
emails CCIU now relies on, Grievant stated her intent not to
resign to every CCIU representative who possibly could have had
the wrong impression, including Strachan, O'Neill, Harper and
Dr. O'Brien himself.  Rather than requesting something in
writing or speaking with Grievant directly, Dr. O'Brien notified
her on February 14, 2018 that he was "considering recommending
[her] dismissal to the Board of Directors" (J-3).  He apparently
ignored Grievant's reiteration of her desire to continue at work
that she stated at the February 23, 2018 Loudermill hearing.
The relevant case law establishes that a resignation offer must
be accepted prior to being effective, and the evidence shows
that this did not occur in the present case.

To the extent the CCIU suggests that resignation was achieved in Grievant's case because it relied on its apparent misimpression that she had offered her resignation, there is no support for this proposition in the relevant law. Also, CCIU did not act on its misimpression in any legally meaningful way prior to Grievant's clarifications of her intentions. Consistent with its practice when BVA faculty members take extended absences, the CCIU "shuffle[d] and move[d] some folks around and look[ed] at [its] existing caseload" so it did not have to hire anyone to fill in after it stopped paying Grievant, and it issued her notice that Dr. O'Brien would recommend her dismissal (TR. 119). Ten months later, in October 2018, for the first time the CCIU hired an individual as a long-term substitute teacher at BVA to fill in for Grievant. That person had been hired previously as a substitute teacher for a BVA faculty member who was on maternity leave before Grievant's last day of work.

The Association also contends that there is no evidence to support a finding that Grievant abandoned her job. The standards for establishing such a finding are both demanding and well-settled in case law: The public employee must express a "definite intention" to give up her position, and the employer must perform an act clearly acquiescing to her decision to give it up. *West Shore Sch. Dst. v. Bowman*, 409 A. 2d 474, 479 (Pa. Cmwlth. 1979). *See also Bruckner v. Lancaster Cnty. Area Vocation-Technical Joint Sch. Operating Comm.*, 467 A. 2d 432, 435 (Pa. Cmwlth. 1983). CCIU has established neither of these required elements in the present case.

In the Association's view, *Bowman* is on all fours with the present case. There, the teacher took unapproved time at the end of approved leave, but the Court found no job abandonment. Given the teacher's communication with the school district about her health, the court found she had not "expressed a definite intention to abandon her contract" and the school had "acted in haste and without sufficient reason to believe that [the teacher] intended to terminate her employment" *Id* at 479. In *Bruckner,* the Court held there was no abandonment when a teacher left work for a lengthy period with a doctor's excuse, stated that he wished to return, and responded to the

school's inquiries about his health for six months.  The court
observed that he did not "express an intention to abandon his
contract" and actually had "expressed his intention to continue
to teach."   *Id* at 435-436.  In contrast, the Association points
to *Jacobs v. Sch. Dst. of Wilkes-Barre*, 50 A. 2d 354 (Pa. 1947),
where the court held the teacher intended to abandon her
position because she had failed to report to work for two
consecutive years, failed to communicate with the district,
ignored the district's inquiries, and failed to follow rules
regarding maternity leave.

        The Association points out that the period between
January 10 and March 5, 2018 -- the period CCIU labels "job
abandonment" -- was shorter than the disputed period in *Bowman*
and *Bruckner* and full of earnest communication from Grievant
about her desire to continue to work.  It is undisputed that
Grievant used leave to which she was entitled from January 10 to
January 24, 2018.  During this period and after, she was
actively attempting to engage CCIU in the interactive process of
providing disability accommodations.  As she testified, she "was
waiting for the CCIU to inform me that I could come back to work
with accommodations in place" (TR. 163).  After January 24,
2018, Grievant was working with the Association and the CCIU on
a possible settlement agreement regarding her employment that
the CCIU itself had generated.  On all the relevant evidence,
including Grievant's stated desire to continue to work, CCIU's
claim that she abandoned her job fails to be credible, let alone
to meet the standard of proving that she had a "definite
intention" to abandon her position.

        The Association contends that the CCIU also has failed
to produce evidence that it ever recognized Grievant's purported
contract abandonment.  In fact, the evidence indicates that the
Board of Directors continues to consider Grievant an employee.
No vote -- resignation or otherwise -- ever has been conducted
by the Board, which has continued to refer to Grievant as an
"employee on leave" (A-4).  Nor can the hiring of an individual
to fill in for Grievant 10 months after her claimed job
abandonment -- and Grievant's and the Association's dispute of
the claim -- constitute the CCIU's "acquiescence" (A-2; A-4).
Unlike in *Jacobs*, where the school attempted to clarify the
teacher's intention for one calendar year, CCIU never attempted

to clarify its impression that Grievant had abandoned her job, despite numerous contrary communications from Grievant beginning with her February 7, 2018 email to Strachan (A-18).  Moreover, practically no time elapsed between the January 23, 2018 email relied upon by CCIU and Dr. O'Brien's February 14, 2018 letter to Grievant alleging "abandonment of position" (Compare ER-4, p.1; ER-5, pp. 1-2, and J3).  In fact, Dr. O'Brien testified that he decided "right after January 23rd" that if Grievant was not going to resign, she would be terminated (TR. 62).

According to the Association, this case fits squarely within Pennsylvania law that establishes that when a public employer has refused to reinstate an employee following its incorrect legal conclusion regarding resignation or job abandonment, that effectively has caused the employee's termination.  *Iorio v. Borough of Carnegie*, 487 A. 2d 53 (Pa. Cmwlth. 1985).  In Grievant's case, says the Association, her dismissal was deficient and invalid.

The Association points out that the Pennsylvania School Code establishes that the board of school directors must provide a tenured professional employee with a written statement of the charges and an opportunity to be heard before the board before the employee is terminated.  24 P.S. §11-1127.  The School Code also contemplates that the Section 1127 requirements apply even in cases where the employee chooses the path of grievance arbitration.  24 P.S. §11-1133.  Grievant's due process rights were violated because none of the statutory requirements were implemented in her case.

No statement of charges and notice of hearing ever was provided to Grievant that was signed by the CCIU Board of Directors and attested to by the Board Secretary.  Under relevant case law, a CCIU Executive Director has no authority to dismiss a tenured professional employee.  Dr. O'Brien's untitled February 14 and March 5, 2018 letters to Grievant fail even to satisfy the fundamental purpose of Section 1127, which is to ensure that it is a school's board of directors, and not its administration, that initiates a tenured professional employee's dismissal.  Moreover, the evidence here, including the CCIU Board minutes, suggests that the Board has not even been made

aware of the nature of Grievant's separation from employment, let alone initiate the separation.

Additionally, a professional school employee's contract can be terminated only for grounds listed in Section 1122 of the School Code. 24 P.S. §11-1122. Dr. O'Brien's letters provide conflicting information regarding the section of the School Code under which Grievant is being charged: the February 14, 2018 letter mentions Section 1122 but fails to specify any ground enumerated there; and the March 5, 2018 letter refers to Section 514 of the School Code, a section that is not related to professional employees. Also, the March 5, 2018 letter reverses the CCIU Board of Director's burden to establish a hearing date, instead offering Grievant the opportunity to demand a hearing and informing her that her request for a hearing would be waived if she did not do so by a certain date.

The Association contends that Grievant's due process, as well as the CBA, was violated by the CCIU Board's failure to actually vote to terminate her employment. The CBA requires that "a two-thirds (2/3) majority of the Board shall vote for dismissal at a public meeting of the Board" before any tenured professional employee can be dismissed (J-1). Here the CCIU discontinued Grievant's pay and told her in a letter of the administration's recommendations, and the CCIU's governing body has not taken any action on her dismissal. Grievant has not received the due process due her under the statutory law and the CBA. Thus, her *de facto* dismissal is invalid. *See Athens Area Sch. Dst. v. Athens Area Educ. Ass'n* (Arb. Buchheit 2019), where the employer's termination decision was reversed in similar circumstances.

The Association points out that the CBA requires that CCIU have "cause" to terminate a tenured professional employee (J-1), and it contends that this requirement was not met in Grievant's case. In determining whether cause existed, Pennsylvania courts traditionally ask if the punishment is fair and reasonable in light of all circumstances surrounding an employer's disciplinary act, often utilizing the seven-question test set forth by CCIU as an analytical framework. Normally a negative answer to one of the questions indicates the absence of

cause, but in this case all seven questions must be answered in the negative.  In the Association's view, this is because CCIU had to resort to retrofitting its incorrect legal position regarding resignation and job abandonment into supposed grounds for termination.

In a usual termination case, the charges against an employee set forth purported misconduct or policy violations, but that is not so in this case.  Instead, Executive Director O'Brien's correspondence explaining his recommendation to terminate Grievant identifies five "key issues," four of which involve her absence from work or communications it characterizes as her resignation:

1. Not reporting to work at all since January 10, 2018.

* * * *

2. Using sick, personal time and calendar adjustment time after being denied some of your medical accommodation requests.

* * * *

3. Resigning your employment with Chester County Intermediate Unit on January 23, 2018.

* * * *

5. Resigning your position with Chester County Intermediate Unit.

(J-4)

The Association contends that neither Grievant's use of benefits to which she was entitled nor her communication about considering resignation constitutes grounds for her dismissal under either a cause standard or the School Code.

Regarding a fifth "key issue" set forth in the correspondence -- "4. Failure to submit FMLA documentation to support your time off in a timely manner" (J-4) -- the Association points out that this refers to a mere inquiry Grievant made about FMLA, not a request for that leave. Even if Grievant had asked for leave at that time and missed a paperwork deadline, however, that would not have formed a rational basis for her dismissal. Rather, the proper response would have been to deny the requested leave.

The Association contends that CCIU has presented no competent evidence to support its administration's decision to effectively suspend and dismiss Grievant from her employment. For the reasons set forth above, the Association asks the Arbitrator to sustain the grievance and to issue a make-whole remedy. The Association submits that a proper make-whole remedy in this case is reinstatement without loss of income, benefits, retirement, or seniority to January 10, 2018, full back pay, reinstatement of employment benefits used, reimbursement for any expenses that would not otherwise be incurred, including statutory interest as required by the School Code, and removal from Grievant's personnel file of any disciplinary records related to the conduct involved in this case.

<u>FINDINGS</u>

My jurisdiction in the present case arises under the parties' CBA and is limited to resolution of the Association's claim in the grievance that the CCIU violated the CBA. The controlling contractual provision incorporates by reference the Pennsylvania School Code, and, at arbitration, the parties agreed that the scope of my jurisdiction does not include resolution of any claims that may exist under any other state or any federal statute. In accordance, the parties did not present evidence or argument in this proceeding that addresses the facts or the procedural or substantive law related to any such statutory claim. The present decision will include no findings -- and will express no opinions -- about any such statutory dispute involving CCIU and/or Grievant. Nor will this decision address any settlement discussions that may have occurred or the

Investigatory Report which was presented to CCIU by outside
counsel on September 17, 2018.

        The face of this grievance challenges "Employer's
(CCIU's) suspension and Executive Director Dr. Joseph O'Brien's
recommendation of the termination of Grievant's employment as
being without just cause and in violation of the parties'
collective bargaining agreement" (J-2).  The controlling
language appears in Article VII, EXISTING POLICIES AND
PRACTICES, Section O.  Due Process.  Subsection 1 of that
provision provides that "the Board and the Administration shall
not have the right to discipline a tenured professional employee
except for cause," and subsection 2 provides that
"[d]isciplinary actions which the Board or Administration may
take, provided that just cause exists, shall include...
suspension from employment duties without pay...or dismissal for
cause" (J-1).

        Subsection 7 of Article VII, Section O provides that
"[t]his section shall apply to disciplinary actions only and
shall not apply to...abandonment of contract [or] resignation"
(J-1).  In part, CCIU claims that Grievant resigned from her
employment or, in the alternative, that she abandoned her job;
therefore, CCIU claims, its actions with respect to her
employment status are not subject to the just cause requirement
established in Article VII, Section O, subsection 1.

        Grievant's last day at work in her position as BVA
Math Teacher was January 10, 2018, and there is no dispute that
she satisfied all applicable reporting requirements and used
benefits to which she was entitled to cover her absences from
work from January 11 through January 23, 2018.[7]  Regarding both
its claim that Grievant resigned her employment and its claim
that she abandoned her job, CCIU relies on evidence regarding
her conduct beginning on January 23, 2018.

        It is undisputed that Grievant never presented written
notification that she was resigning to Executive Director

_____

[7] The last day for which she was paid was January 24, 2018, and
there is no dispute about whether there was a legitimate basis
for her compensation for that day.

O'Brien or the CCIU Board of Directors.  Rather, regarding its
claim that Grievant resigned, CCIU relies primarily on an email
message she sent on January 23, 2018 to Noreen O'Neill and Niki
Harvey, who directed the IES program in which Grievant served as
a course developer and a facilitator in addition to her primary
duties as a BVA Teacher.[8]  In part, Grievant's email message to
O'Neill and Harvey states:  "Sadly, I have decided to resign
from my role as BVA Math Teacher" and "I have decided to accept
a flexible... opportunity" with another employer (ER-4).  That
same day, Grievant wrote to her direct supervisor, Supervisor
for Online Learning Chip Harper, and to his supervisor, Director
of Communications and Learning Solutions Mary Jeanne Curley, to
ask, respectively, if she could send a goodbye message to her
students and families and if she could send such a message to
her colleagues.

        Grievant does not dispute that she intended to resign
when she sent the email messages described above on January 23,
2018, but she testified, "I said I decided to but, however, I
never did" (TR. 164).  This testimony is supported by the
evidence regarding Grievant's communication with CCIU in the
period following January 23, 2018.  On an unspecified date, the
new job opportunity Grievant had decided to accept fell through.
Regardless of the underlying reason(s) for Grievant's change of
heart, however, she directly and repeatedly informed members of
CCIU's administration that she no longer intended to resign far
in advance of the 60-day period after which any resignation
submitted on January 23, 2018 would have become legally
effective.  Under the express terms of the School Code, a
professional employee's written resignation becomes effective 60
days after being "presented" by the employee.  [24 PS §11-
1121(c)]

        For example, in a February 7, 2018 email, Grievant
informed Strachan, "...I am still unable to return to BVA due to
health conditions" (A-18).  On February 11, 2018, she sent an
email to a member of IES, copied to O'Neill and Harvey, that

---

[8] I do not credit a text Grievant sent to an Association officer
setting forth a message addressed to Strachan as evidence that
she presented notification to CCIU that she was resigning.

stated:  "My resignation from BVA has been rescinded and
discussions regarding employment status are ongoing" (A-5).

        The Association has submitted judicial precedent,
including the *Horner* case, which establishes that principles of
contract law govern disputes over the completion of a
Pennsylvania Public employee's resignation from employment; this
requires both the offer and the acceptance of a public school
employee's resignation prior to its effectiveness.  On the
totality of relevant evidence, I do not find that Grievant
resigned from her position with CCIU.  She did not present a
written resignation in accordance with the procedure established
in Section 1121 of the School Code.  There also is no evidence
that CCIU notified her that it accepted the resignation it now
claims she offered in the informal email message before she
rescinded it far in advance of when it would have become
effective under Section 1121.  Additionally, no one in CCIU
administration ever provided any informal message from Grievant
regarding resignation to the CCIU Board, which identified
Grievant in the minutes of its October 2018 Board meeting as an
"employee on leave" (ER-4).

        The necessary inquiry regarding CCIU's claim that
Grievant abandoned her job was set forth in the *Jacobs* case,
where the Pennsylvania Supreme Court established that, beyond
the statutory bases for termination of a professional employee's
contract, an employee's abandonment of his or her contract is a
third method.  If it is found that the employee expressed a
definite intention to abandon his or her contract and that the
employer performed an act acquiescing in the abandonment, these
acts may be found to culminate in abandonment and mutual
rescission.

        I do not find that the relevant evidence in this
record establishes that Grievant expressed a definite intention
to abandon her contract.  This evidence does not reflect an
employee who fails to show up for work without reporting off,
while also failing to communicate with her employer about her
desires and intentions with respect to returning to work.  On
the contrary, the undisputed evidence shows that the parties
were in ongoing discussions regarding Grievant throughout the
approximately two-week period from January 24 to February 7,

2018,[9] and that Grievant communicated with her employer directly thereafter, including about her desire to return to her job. As Grievant attested, between January 24 and February 7, 2018, when she sent Strachan the message stating that she still was unable to return to work because of her health conditions, she had been absent from work after she had exhausted her leave for a total of only seven days. As detailed above, Grievant sent an email to members of the administration about her rescission of her resignation only four calendar days later, on February 11, 2018.

Only three calendar days later, on February 14, 2018, Dr. O'Brien notified Grievant that he was considering recommending her dismissal to the CCIU Board of Directors for the proposed charge of "abandonment of position"; he noted that Grievant had failed to report to work or report absences from January 25 through February 14, 2018" for a total of thirteen work days" (J-3). Grievant's Loudermill hearing was scheduled for February 23, 2018, and on February 21, 2018 Grievant sent an email to Strachan, Curley, Harper, CCIU's outside counsel, and Grievant's Association representative, which, in relevant part, stated: "I do not want to leave my job at CCIU and I want to work after I have had sufficient time to care for my health conditions.... (A-1). On the next day, February 22, 2018, Grievant submitted paperwork related to leave under the FMLA. The minutes of the February 23, 2018 Loudermill hearing reflect that there was a multi-faceted discussion regarding Grievant's employment, including multiple requests and complaints on her behalf that are not within the scope of the present grievance. For purposes of the present decision, however, these minutes do not reflect that Grievant had expressed an intention to abandon her job. Indeed, as part of her Closing Statement, Grievant's Association representative stated that "this was not job abandonment" and that "it is [Grievant's] intent to return to work at the CCIU" (ER-2).[10]

---

[9] This record includes no information about the content of those discussions; nor is that information relevant to or necessary for purposes of the present decision.

[10] CCIU now claims that Grievant acknowledged at this hearing that she had resigned on January 23, 2018, but it provided no cogent explanation for why, instead of formally accepting a

It also should be noted that the evidence falls short of showing that the second prong of the test established in *Jacobs* was satisfied in the present case. In particular, the evidence shows that it was not until October 2018 that a long-term substitute (Brodhag) was appointed to fill Grievant's position as a BVA Online Instructor, effective October 10, 2018.[11] Even accepting CCIU's claim that filling in for Grievant during her period of unexcused absence in January-February 2018 was not easy and had an impact on students in her classes, that was equally true in the weeks prior to January 25, 2018, when Grievant was absent from work on various types of leave. This was a consequence of her absence from the classroom, not any uncertainty during the weeks in issue that may have been triggered by Grievant's conduct, including her statements regarding resignation.

The totality of the evidence warrants the inference that the employment relationship between CCIU and Grievant was uncertain and mutually confusing during the period in issue. Nonetheless, that period was much shorter than the period involved in the *Bowman* case, where the court found that the employee had neither abandoned nor terminated her job and found further that "the District acted in haste," effectively discharging her (*Bowman*, 409 A.2d at 479).

On March 5, 2018, O'Brien sent a written notice to Grievant that he intended to recommend her dismissal to the CCIU Board at its regularly scheduled meeting on March 21, 2018. The Association filed a responsive grievance on March 19, 2018, which noted that Grievant declined her right under the School Code to request and appear at a hearing before the CCIU Board. O'Brien never recommended Grievant's dismissal to the Board, but

_____

resignation when she offered it, it considered dismissing her instead, including at the Loudermill hearing held a month later, as well as thereafter.

[11] The minutes of the October 17, 2018 meeting note that the "Reason" for Brodhag's appointment was "LTS for employee on leave," under which Grievant's name appears in parentheses (A-4).

CCIU now claims that the evidence in this record establishes that there was just cause for her suspension pending termination.  In accordance with the *Ioria* decision submitted by the Association, I find that CCIU effectively caused Grievant's service to be terminated.  Thus, the just cause requirement established in Article VI, Section O of the CBA applies to her termination.

O'Brien's March 5, 2018 notification to Grievant stated:

> Your proposed dismissal is a result of your failure to report to work and your failure to report your absences or request a leave of absence from January 25 through February 22, 2018 [the date on which Grievant's FMLA documentation was received by CCIU].  It is also due to written communications noting you resigned from CCIU.  The following are key issues:
>
> 1.  Not reporting to work at all since January 10, 2018.  You reported you were unable to work and used sick time on January 11, 12, and 16, 2018.  From January 16 through January 19, you did not report to work at all, instead you used a combination of sick days and calendar adjustment time.
>
> 2.  Using sick, personal time and calendar adjustment time after being denied some of your medical accommodation requests. You requested to work from home on January 17 and 18, 2018.  When this request was denied, you used sick days for this time off.  In addition, you used a sick day on January 19, 2018.
>
> 3.  Resigning your employment with Chester County Intermediate Unit on January 23,

2018.  On January 23, 2018, you emailed
your supervisor, Chip Harper, a request
to send a goodbye message to your
students.  In addition, on the same day
you emailed Mary Curley, Director of
Communications and Learning Solutions a
request to send a goodbye message to
staff.  You also returned your CCIU
issued laptop on January 24, 2018.
During the Loudermill hearing on
February 23, 2018, you admitted to
resigning your position on January 23,
2018.

4.  Failure to submit FMLA documentation to
support your time off in a timely
manner.  On January 19, 2018, you were
provided information on your eligibility
for FMLA and documentation required from
your physician.  This paperwork was due
back by February 3, 2018 and was not
received until February 22, 2018, three
weeks after the deadline and after you
resigned your position.

5.  Resigning your position with the Chester
County Intermediate Unit.  In an email
to Noreen O'Neill and Niki Harvey on
Tuesday, January 23, 2018 – you stated
"Sadly, I have decided to resign from my
role as BVA Math Teacher, and understand
that in doing so; it is highly likely
that any scheduled, ongoing, or future
assignments within any CCIU divisions
may also have to cease as well."  In the
same email, you stated "I have decided
to accept a flexible, "work from
anywhere" (including camping),
opportunity as an Administrative
Assistant with DXC technology."  These
two statements clearly indicated you had

                    resigned all of your positions with the
                    Chester County Intermediate Unit.

                              (J-4)


          A just cause determination must be made on a case-by-
case basis, in light of all relevant facts and circumstances
which pertain in a given case.  The initial inquiry is whether
the involved employee is found to have committed the misconduct
for which she was terminated.  If so, depending on the factual
record in that particular case, there may be subsequent
inquiries regarding a variety of due process concerns, some of
which are addressed in the "seven questions" addressed by the
parties.

          The March 5, 2018 letter's descriptions of Key Issues
1 and 2 expressly involve the dates January 11 through 19, 2018,
when Grievant used sick leave she was entitled to and approved
calendar adjustment time.  Key Issues 3 and 5 describe
Grievant's alleged resignation on January 23, 2018, which has
been found above never to have become legally effective; a
putative resignation that was not effective under the School
Code hardly could constitute just cause for Grievant's dismissal
under the CBA.[12]  Regarding Key Issue 4, this record contains no
evidence regarding Grievant's eligibility for leave under the
FMLA, and no such issue has been presented for decision here.
For purposes of the present decision, it suffices to say that
Grievant's failure to return FMLA documentation in a manner that
was considered timely by CCIU does not constitute conduct that
would subject her to discipline, including termination.

          Grievant's absence from work during the January 25
through February 22, 2018 period cited in the March 5, 2018
letter was unexcused.  That, in itself, may have provided just
cause for some discipline, but, particularly given her

_____

[12] Moreover, CCIU has provided no cogent explanation for why it
would later treat a resignation on Grievant's part as a
contributing factor in grounds for her dismissal rather than
formally accepting the resignation in a timely manner when it
was offered.

employment record, it would not have provided cause, including
"just cause," for her dismissal.  On that score, CCIU is correct
in asserting that, like all employees, Grievant had an
obligation to safeguard her employment.  But, as detailed above,
the evidence indicates that she attempted to do so during the
period in issue, including engaging with CCIU to explore certain
possibilities regarding whether and when she could return to
work.  And there is no evidence that CCIU ever provided Grievant
with written notification that if she failed to report to work
on or by a specific date that failure would result in her
termination.

        In sum, CCIU has not established a convincing basis on
which to conclude that Grievant resigned from her job, as
provided for under the School Code, that she abandoned her job,
as contemplated under existing case law, or that there was just
cause for her dismissal under the CBA.[13]  Accordingly, Grievant
is entitled to be reinstated to her tenured position at CCIU.
The evidence, however, is insufficient to establish whether,
and, if so, when, Grievant would have returned to active
employment given her medical condition.  This issue is further
complicated by the existence of statutory claims that Grievant
apparently has asserted, which are not before me.  In these
circumstances, the issue of a full make whole remedy, of
necessity, must be returned to the parties for settlement or
development of the necessary evidentiary basis on which a final
arbitral determination on remedy can be made.

---

[13] In light of the findings above, it is unnecessary to further
address the Association's contention that Grievant's termination
was invalid because she was not afforded her rights under
Section 1127 of the Code.

## AWARD

For the reasons expressed above, the grievance is sustained.  CCIU is directed to reinstate Grievant to her tenured position with full seniority.  The issue of a full make whole remedy is remanded to the parties.  I retain limited jurisdiction, which may be invoked by either party, solely for the purpose of resolving this remedial issue in the event the parties cannot reach agreement.


*Kathleen Miller*
**Kathleen Miller**
**Arbitrator**